## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | **CASE NO. 8:10CV318** |
| **Plaintiff,** | **MEMORANDUM AND ORDER** |
| **ABDI MOHAMED, et al.,** | |
| **Plaintiffs/Intervenors,** | |
| **FARHAN ABDI, et al.,** | |
| **Plaintiffs/Intervenors,** | |
| **vs.** | |
| **JBS USA, LLC, f/k/a JBS SWIFT & CO., a/k/a SWIFT BEEF COMPANY,** | |
| **Defendant.** | |

This matter is before the Court on the Motion for Summary Judgment (Filing No. 342) filed by Defendant JBS USA, LLC f/k/a JBS Swift & Co., a/k/a Swift Beef Company ("JBS"), and the Motion for Partial Summary Judgment (Filing No. 343) filed by Plaintiff Equal Employment Opportunity Commission ("EEOC"). The parties have filed briefs and indexes of evidence in support of their respective positions. For the reasons stated below, JBS's Motion will be granted in part and denied in part. The EEOC's Motion will be denied.

## PROCEDURAL HISTORY

The EEOC alleged in its initial Complaint (Filing No. 1) that JBS engaged in a pattern or practice of discrimination against Somali Muslim employees at its Grand Island, Nebraska, facility. In its Amended Complaint (Filing No. 99), the EEOC identified 153 individuals for whom it seeks relief. Two groups of allegedly aggrieved

employees[1] filed Complaints in intervention, but no class has been certified pursuant to Fed. R. Civ. P. 23.

On April 15, 2011, the parties entered into a bifurcation agreement (Filing No. 76-1) that Magistrate Judge Gossett adopted and approved (Filing No. 81). The agreement divided the discovery and trial into two phases: Phase I relates to pattern-or-practice claims to be addressed using the *Teamsters* method of proof,[2] and to employment practices and workplace events leading up to and encompassing Ramadan 2008. The parties have agreed that Phase I should be tried to the Court and not a jury. (Filing No. 403.) Phase II relates to individual claims and relief and any claims for which no pattern or practice liability was found in Phase I. The Intervenors have been precluded from participating as parties during Phase I; their participation during Phase I is limited to the role of fact witnesses. (Filing Nos. 296, 338.)

The present Motions relate only to the three Title VII, pattern-or-practice claims the EEOC is pursuing in Phase I of this lawsuit: (1) unlawful denial of religious accommodations concerning break times for prayers[3]; (2) unlawful termination based on religion and/or national origin; and (3) unlawful retaliation for engaging in a protected activity. (*See* Filing No. 76-1 at 2.) The unlawful retaliation claim includes adverse

---

[1] Referred to herein as the "Intervenors".

[2] So called for the decision in *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977), laying out a framework for analysis of claims when the government seeks to remedy systematic practices of employment discrimination.

[3] The EEOC alleges that JBS failed to accommodate the allegedly aggrieved Somali Muslim employees (1) by failing to grant their requests to leave the meat processing line to pray despite granting non-Somali Muslim co-workers' requests to leave the line to use the bathroom, and (2) by, during Ramadan 2008, refusing to move the B Shift dinner break to a time that would have met the Somali Muslim employees' prayer needs.

employment actions such as termination and discipline, but specifically excludes any alleged harassment or hostile work environment claims, which will be tried in Phase II. (*Id.*)  In its Motion, JBS seeks the dismissal of all three of these claims.  The EEOC, in its Motion, seeks to establish as a matter of law that JBS engaged in a pattern or practice of denying reasonable accommodations to its aggrieved Somali Muslim employees' requests for break times to pray.

## FACTUAL BACKGROUND

Unless otherwise indicated, the following facts are stated in the briefs and supported by pinpoint citations to admissible evidence in the record, that the parties have admitted, and that the parties have not properly resisted as required by NECivR 56.1[4] and Fed. R. Civ. P. 56.  The undisputed fact derive from both parties' Motions:

## I.     JBS Operations and Background

### A.     JBS's Grand Island Facility and Operations

JBS, at all relevant times, owned and operated a beef slaughter and fabrication facility in Grand Island (the "Facility).  The United Food and Commercial Workers Union Local 22, which merged with Local 293 in the summer of 2011 (the "Union"), represented all of the hourly production and maintenance employees at the Facility.  A collective bargaining agreement entered into by JBS and the Union (the "CBA") governed the terms and conditions of employment for the hourly production and maintenance employees.  The CBA required JBS to provide two paid rest periods, and an unpaid meal period.  The precise timing of the rest periods was to vary according to production needs or emergencies.  The CBA also expressly prohibited strikes or work

---

[4] "Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response."  NECivR 56.1(b)(1).

stoppages by the Union or its members, and gave JBS the right to determine the appropriate discipline for any employee in breach of this provision.  The CBA also had a non-discrimination clause, and required JBS and the Union to provide religious accommodations based upon employees' religious tenets.   The CBA required employees to make written requests for religious accommodation, and to cooperate with JBS and the Union to explore reasonable alternatives.

In 2007 and 2008, the Facility operated three shifts: two production shifts and a clean-up shift.   One of the production shifts ran from 6:00 a.m. to 2:30 p.m. (the "A Shift"), and the other production shift ran from 3:00 p.m. to 11:30 p.m. (the "B Shift"). (Dep. of Mary Chmelka, Filing No. 347-1 at 92:4-22; Dep. of Cindy Davis, Filing No. 347-4 at 85:10-86:20.)[5]   A majority of Somali Muslim employees working at the Facility worked in fabrication on the B Shift.

Under the CBA, the B Shift's first scheduled break occurred between 5:00 p.m. and 6:00 p.m., and the lunch or meal break occurred between 7:30 p.m. and 8:30 p.m., with employees beginning these breaks on a "rolling basis."   That is, employees would leave the production line to go on these breaks once they finished processing the meat in front of them and no more meat was coming down the line.  As a result, employees at the beginning of the line went on their thirty-minute meal break first while those at the end of the line went on their thirty-minute meal break last.   Twenty to thirty minutes could elapse between the time the first employee left the production line to start his or her break to the time the last employee left the production line for the break.   If the

_____

[5] References to depositions in this Memorandum and Order will note the CM/ECF filing number ("Filing No.") and deposition page number.

4

employees were to take a "mass break" instead of taking their breaks on a "rolling basis," all employees would leave the production line at the same time and meat would remain on the line.  Mass breaks were unpopular, because when all employees left the production line at once, there was insufficient time for everyone to go to the cafeteria, eat, use the restroom, and get back to the line before the break is over.

In addition to the regularly scheduled rest and meal breaks, an employee could make a request to his or her supervisor for an unscheduled break.  For example, an employee could request to leave the production line to use the restroom.  The EEOC presented evidence that in 2007 and 2008, there was no authorized unscheduled break policy to allow a person to pray, as opposed to using the restroom.[6]   The only authorized unscheduled break was for restroom use. (Filing No. 344-2 at 247:15-248:10.)  Under the informal break policy, employees could ask for time to go to the restroom, and such breaks had no specific set time limit and could last up to fifteen minutes. (*Id.* at 33:14-22, 34:24-35:6.)  The company's "standard practice" was not to allow employees to leave the line, other than for physical needs. (Filing No. 344-2 at 259:21-260:6.)

The Facility's operations were divided into two separate areas: slaughter and fabrication.  Both areas operated on a production-line basis.  That is, a "chain" moved beef, in one direction, from slaughter to a cooler, then from the cooler through

---

[6] JBS does not dispute that witnesses testified to many facts, but disputes that this testimony establishes a pattern or practice of discriminatory behavior, or that the EEOC's characterization of the testimony demonstrates corporate policy or a standard practice.  (*See generally* Filing No. 429 at 7-17.)

fabrication,[7] and then from fabrication into packaging. The chain could stop for various reasons, such as mechanical failure, cattle grade changes, a cattle abscess, or employee fights. It also could be set to move at varying speeds, calculated on a "head per hour basis." Working on the production line consisted of hard, manual labor, and required employees to wear safety equipment that included a frock, hair net, beard net, hard hat, ear protection, gloves, and steel toed boots. It usually took at least two to three minutes for an employee to don or doff this equipment, which the employee had to do to leave the production line to go on or return from a break.

### B.    JBS's Discrimination Policies and Training

The Facility had an employee handbook that included policies that prohibited discrimination, retaliation, and harassment. (Filing No. 356-1.) JBS also had separate policies, a Harassment and Retaliation Policy (Filing No. 356-2) and a Zero-Tolerance Policy (Filing No. 356-3), that prohibited discrimination and retaliation. These separate policies were disseminated and posted at the Facility. During orientation, representatives from the Union also mentioned that, in general terms, discrimination was prohibited at the Facility.

### C.    JBS's Industry and Employee Break Schedules

JBS is in a competitive industry with very low margins, and having employees off the production line had an adverse financial impact on JBS. The negative financial impact increased the longer an employee was off the line and with each additional employee that stepped off the line. An employee leaving the production line for an unscheduled break could affect other employees and production levels depending on

---

[7] Different lines of employees perform different jobs on the beef as it moves through fabrication.

6

the number of employees leaving the line at one time and whether or not there were other employees available to cover for those leaving.   For example, those who remained on the line needed to work harder and faster when someone stepped off the line.   There is evidence that meat piled up when employees stepped away from the production line for restroom breaks.

Rigid break schedules would prevent the Facility from minimizing the disruption of mechanical breakdowns.   Flexible breaks would minimize such disruptions by allowing employees to go to break when machinery was inoperable and being repaired. Equipment breakdowns and cattle-grade changes are unpredictable.  If an equipment breakdowns occur during the flexible window of time for a rest or meal break, employees may go on a break while the equipment is repaired.

### D.        General Tenets of the Muslim Faith & Intervenors' Varied Beliefs

Muslims believe the Qur'an is the literal word of God.  They also believe that they should pray in accordance with the Prophet Muhammad's teachings, which call for five prayers a day: (1) morning, referred to as the fajr prayer; (2) noon, referred to as the dhur or zuhr prayer; (3) afternoon, referred to as the asr prayer; (4) evening/sunset, referred to as the maghrib prayer; and (5) night, referred to as the isha prayer. Ramadan is one month of the year in which Muslims are expected to, among other things, fast from dawn to dusk.  Muslim prayer requirements, however, are year round.

The individual Intervenors in this case have varied beliefs with respect to: (1) the window of time within which they must recite their daily prayers; (2) the length of time required to complete their daily prayers; (3) the prayer schedule that should be followed; (4) the exact time at which each of the five daily prayers should be recited; (5) when it is

permissible to skip a payer, combine prayers, or pray late.    For example, while some of the Intervenors believe there is no permissible window of time (the prayer must be performed at an exact time), others believe it is permissible to perform the prayers within five, ten, or fifteen minutes--and depending on the prayer, within certain hours--of a specified prayer time.  With respect to all of the prayers except the morning prayer, the time it takes the Intervenors to perform their prayers can be anywhere from less than five minutes to up to fifteen minutes.

In 2007 and 2008, JBS permitted its employees to pray in the Facility, at least during regularly scheduled breaks, except in areas that posed a safety risk.  The EEOC presented testimony that the company's policy was that Muslim employees could only pray on regularly scheduled breaks, which were the first break and the meal break. (Filing No. 344-3 at 131:14-17.)   "They were not allowed to use what you call an informal break to pray. It was only for restroom breaks." (*Id.* at 131:24-132:3.)

## II.    Events Leading To EEOC's Charge

### A.    2007

In Spring of 2007, a group of Somali Muslim employees took part in a "walk out" due to break-time issues with their sunset prayer.  In an attempt to avoid a possible work conflict with sunset prayer practices, management at the Facility told some of the Somali Muslim employees they could request a transfer to the A Shift.  Four or five Somali Muslim employees so requested, and were transferred to the A Shift.

In July 2007, JBS began to analyze the impact of accommodating prayer requests.  As part of this process, JBS requested that the average cost of one minute of down time be calculated for both the slaughter and fabrication areas of the Facility.  The

calculation revealed that down time necessary to accommodate prayer requests would result in a cost that JBS considered significant.

### B.    2008

In September 2008, JBS sought to determine whether it should adjust meal breaks to coincide with the evening prayers, and JBS compared production and break schedules with Islamic prayer times throughout the year.   JBS also considered the possibility of a mass break during Ramadan, and analyzed the cost impact of such breaks.

On September 10, 2008, during the B Shift, a trainer at the Facility grabbed a Somali Muslim woman's shoulder after he had instructed the woman to move her position on the production line.  Some of the other Somali Muslim women on the line felt the trainer had mistreated the woman by grabbing her shoulder.   Several of those women left the production line and met with Mary Chmelka, a JBS human resources manager, to discuss the incident.  Those women returned to the production line and, soon thereafter, went to pray in a storage area.

Some of the women placed cardboard pieces on the floor to kneel for prayer. The operations manager and superintendent for the B Shift both entered the storage area where the women were praying.  Some of the women felt the operations manager and superintendent had interrupted their prayer.  As the women left, the superintendent picked up the cardboard on which some of the women had prayed.  One of the women believed the superintendent kicked her cardboard piece, thereby showing disrespect for her prayer.  Because of the perceived interruption and disrespect, the women became upset.  Thereafter, the operations manager and superintendent escorted the women to

9

Chmelka's office.   Chmelka perceived them to be very emotional, so she sent the women home.   Chmelka told them she would investigate the incident, and asked that they return to work on September 12, 2008.   That night, after those women had been sent home, the rest of the production line worked until 3:00 a.m. or 4:00 a.m., resulting in JBS incurring overtime expenses.

On September 11, 2008, a group of Somali Muslim employees met with the Union regarding break times and prayer issues.   After meeting with the Union, the group of employees approached Chmelka about the incident that occurred the previous day. Chmelka arranged to have a meeting the next day with JBS's management, the Union, and some of the Somali Muslim employees to discuss that incident and "prayer issues."

On September 12, 2008, the Facility's manager, Dennis Sydow, began the meeting by quashing a rumor to the effect that some of the Somali Muslim women involved in the incident had been fired.   The parties then began to discuss prayer breaks.   One of the six Somali Muslim employees present at the meeting, acting as a translator for the other five Somali Muslim employees, asked whether they would be allowed to leave the production line to pray "on time."   The Somali employees suggested that they be allowed to leave the production line for five minutes, one by one, to pray while someone covered for them on the line.   (Filing No. 356-7 at CM/ECF p. 2.) Sydow indicated that he and others had considered the idea, but had concluded it was not a good solution because it would affect productivity and quality if people went back and forth on the production floor.   Sydow also mentioned that moving the meal break earlier would cause problems due to constraints in the CBA.   The translator inquired about receiving prayer accommodations throughout the year.   Sydow indicated the

10

meeting only related to prayer accommodations for Ramadan. The participants agreed to meet again on September 15, 2008, so that the six Somali Muslim employees would have a chance to discuss the meeting with other Somali Muslim employees. Chmelka concluded the meeting, stating that the Somali Muslim employees could pray during their scheduled breaks anywhere in the Facility.

On September 13, 2008, JBS's corporate vice president, Jack Shandley, sent an email inquiring whether a prayer accommodation that allowed employees to leave the line within ten minutes of sunset could be accomplished. In that email, Shandley indicated to Sydow and Chmelka that supervisors needed to be consistent with how they handled prayer issues on the production floor.

On September 15, 2008, Union officials met with a group of Somali Muslim employees at the Union's office to discuss prayer breaks at the Facility. That same day, JBS's corporate director of finance, Heather Skinner, received directions to analyze the cost of providing JBS's employees an additional ten-minute break. According to Skinner, the costs "add[ed] up quickly." (Filing No. 361-3 at CM/ECF p. 2.) JBS management also held its second meeting with certain Somali Muslim employees to discuss their prayer issues in more depth.

At the meeting, Sydow noted that JBS received information the previous year indicating that there was a forty-five minute window for Muslim prayer before and after sunset. He asked the Somali Muslim employees present at the meeting why the window was different in 2008. After "some discussion among the group" (Filing No. 356-8 at CM/ECF p. 1), the individual acting as the translator for the Somali Muslim employees answered that the correct window of time for the prayer at sunset was within

11

ten or fifteen minutes of sunset. Two of the employees, one of whom was the translator, asked that JBS allow its Muslim employees to leave the production line to pray for five minutes at a time while others covered for those who left the line. Chmelka replied that there would not be enough time to relieve the approximately 200 Muslim employees within a ten-minute prayer window. Sydow also indicated that the accommodation the Somali Muslim employees proposed could create safety and quality issues. Sydow then raised the possibility of accommodating the Somali Muslim employees by moving them to the A Shift, noting that "[i]t would take a bit of time while someone is trained to replace you," and that it did not "answer the immediate [n]eed but over a period of time that [he] [believed] [it] would solve the problem." (Filing No. 356-8 at CM/ECF p. 2.) Before the meeting adjourned, Sydow reiterated that the employees could "pray wherever they want and no one will bother them." (Filing No. 356-8 at CM/ECF p. 3.)

After the meeting, a group of approximately 150 Somali Muslim employees gathered outside the Facility and chose to "strike." Pursuant to this strike, most of these 150 employees did not go to work the evening of September 15, 2008. During the strike, Union officials told the 150 employees that they had to go back to work, and advised them to submit written requests for religious accommodation.

On September 16, 2008, some of the 150 Somali Muslim employees returned to work, while others continued to strike. JBS management, Union officials, and certain individuals acting as representatives for the Somali Muslim employees met again. JBS offered to move the meal break to approximately fifteen minutes earlier in the evening and, at that time, have a fixed mass break, and also to shorten the shift by fifteen

minutes for the remainder of Ramadan.  The Somali Muslim employees and Union officials present at the meeting agreed to JBS's proposal.  Those Somali Muslim employees agreed that the employees would return to work and that a disciplinary notice would be added to the files of those employees who went on strike.  Many of the Somali Muslim employees who were not at the meeting with JBS management and the Union officials learned of the agreement while they were at a park where they were striking.  Sydow memorialized the agreement in a letter he sent to the Union.

Either after the B Shift on September 16, 2008, or some time on September 17, 2008, an unknown person posted signs around the Facility that, in Spanish, encouraged employees to "fight for [their] rights."  (*See* Filing No. 423-5.)  The sign also referenced the 7:45 p.m. meal break and requested that employees meet by the personnel office at 3:00 p.m. before the B Shift.  (*See* Filing No. 423-5.)  Many of JBS's Hispanic employees incorrectly assumed that JBS had given every Somali employee a dollar raise.  Tension increased throughout the day, and after hearing rumors about the 7:45 p.m. mass break, a group of over 100 employees, composed of both A and B Shift workers, the majority of whom were Hispanic, refused to go to the production floor and walked off the job.  This group of over 100 employees moved outside the Facility.

JBS managers, including Sydow and Chmelka, went outside to try to talk to those 100 employees.  Union representatives also attempted to talk to the 100 employees and get them to return to work.  The JBS managers and Union representatives learned that the 100 employees were upset about the change in the B Shift meal break and the shortening of the B Shift.  The managers and Union representatives informed the 100 employees that they were engaging in a work stoppage for which they could be

13

terminated.  The crowd dispersed, and JBS decided to send home the employees who had not walked off the job because there were no longer enough employees on duty to continue with production on the B Shift.  Fabrication workers stayed to perform their jobs, but were only able to process a reduced number of cattle compared to the previous night.  Due to the work disruptions, overall production for the week was significantly less than average.

On September 18, 2008, non-Muslim employees continued to protest outside the Facility and refused to return to work.  In order to get the non-Muslim employees to return to work so the Facility could operate again, JBS management decided to return to its original meal break time and shift length.  Chmelka informed some of the Somali Muslim employees involved in the previous meetings that JBS had decided to change the meal-break time back to how it was before.  Those Somali Muslim employees said they would inform the other Somali Muslim employees.

Prior to the start of the B Shift meal break on September 18, 2008, at around 7:45 p.m. or 7:50 p.m., several Somali Muslim employees stepped off the production line without permission.  Those employees were sent to Chmelka's office for doing so, and Chmelka prepared a written disciplinary notice for one of those employees before allowing him to go to the cafeteria for a meal break so he could break his fast.  Chmelka planned to write disciplinary notices for the other employees who stepped off the production line without permission after their meal break.  Subsequent events in the cafeteria, however, interrupted her plans.

In the cafeteria, some Somali Muslim employees were yelling, slamming their hard hats on the table, and banging their food trays.  Sydow attempted to calm people

14

and told them to return to work.  A Union representative also encouraged employees to go back to work.  At least one Somali Muslim employee heard a manager instructing employees to "go back to work or leave." (*See* Filing No. 350-2 at 236:5-20.)  Another Somali Muslim employee heard Chmelka say "if you guys need to work, go back to the job, if you don't want to work, you can leave your badge and can leave without trouble, without yelling."  (Filing No. 351-2 at 174:3-12.)  At some point, someone called the police and informed them of a disturbance at the Facility that might escalate to something beyond a verbal confrontation.  By the time the police arrived, the crowd in the cafeteria had dispersed.

Approximately eighty Somali Muslim employees left the Facility and did not return.  JBS management met that night and decided to terminate the employees who left the Facility instead of returning to work.  The next morning, September 19, 2008, when those employees arrived at the Facility, they learned of their termination and received their final paychecks.  Some of the Intervenors did not leave the facility during their shift and were not terminated.

## III.    Charges of Discrimination and the Investigation

After Ramadan 2008, the Nebraska Equal Opportunity Commission ("NEOC") received calls from some of JBS's Somali Muslim employees, although the NEOC does not have any records of those calls.  In response to those calls, the NEOC organized a mass intake process at a hotel in Grand Island.

Approximately eighty charges were received on October 2 and 3, 2008, at the hotel. The charges were in English.  Contrary to the NEOC's usual practice, the NEOC did not record the intake meetings conducted at the hotel.  After the mass intake

15

meetings, the NEOC interviewed seven of JBS's management employees; four non-Muslim, non-management JBS employees; and none of JBS's management employees from JBS's corporate office in Greeley, Colorado.  At least one of the three NEOC investigators assigned to investigate the Somali Muslim employees' charges believed that Muslim prayer times were universal and made no effort to determine how many Muslims were on each production line at the Facility.  At some point in 2009, the NEOC transferred all its charge files to the EEOC.

Prior to August 30, 2010, no one from the EEOC was involved in the investigation of any charge forming the basis of this lawsuit, except for Hassan Duwane's charge.  The EEOC is relying on the NEOC's investigation to satisfy its obligation to investigate the charges that form the basis of this lawsuit.  The EEOC and NEOC are parties to a worksharing agreement that references their defined agency relationship.  In the worksharing agreement entered into by the EEOC and the NEOC for fiscal year 2008, the EEOC and NEOC agreed to "each designate the other as its agent for purpose of receiving and drafting charges."  (Filing No. 356-14 at CM/ECF p. 2 ¶ II.A.)  The worksharing agreement references § 706, subsections (c) and (d), of Title VII when describing how the EEOC and NEOC agreed to divide the primary responsibility for resolving charges.  (Filing No. 356-14 at CM/ECF p.2 ¶ III.)

In August 2009, the EEOC issued determination letters including a "cause" finding for each of the eighty-four or eighty-five pending charges.  The letters are identical to each other except for the charging party's name, address, and charge number.  Those letters state: "The evidence obtained during the investigation establishes that Respondent failed to accommodate the religion of Charging Party and

16

the class of Somali Muslim employees and that such accommodation would not have posed an undue hardship to Respondent." (*See*, *e.g.*, Filing No. 358-12.)

In early September 2009, the EEOC began conciliation efforts with JBS.  An EEOC conciliation conference memo noted that the EEOC indicated that, although it would help JBS do so, JBS needed to develop the plan for providing reasonable accommodations to its Somali Muslim employees because JBS knew the details of the situation.  That memo also noted that the EEOC considered the reasonable accommodations issue to be an individual issue; that is, it would differ among Muslim employees.   In a letter dated September 2, 2009, EEOC proposed that JBS promptly develop and implement an effective plan for providing religious accommodation.  The conciliation efforts were unsuccessful, and on August 30, 2012, the EEOC filed suit against JBS.

## IV.    JBS's Current Practices

In 2009, JBS issued written guidelines that addressed its Muslim employees' requests for unscheduled breaks for prayer.  The written guidelines implemented in August 2009 provided that supervisors could allow unscheduled breaks for the restroom and for prayer, at least during the month of Ramadan. (Filing No. 344-2 at 259:21-260:6; Filing No. 344-12, Guidelines for Unscheduled Work Breaks.)  These guidelines instruct JBS supervisors to grant prayer requests in the order received and as operations permit and give requests to use the restroom priority over prayer requests due to safety and occupational concerns.  Employees can leave the production line only to the extent that it does not interfere with production.  Sydow said the change in policy was associated with the prayer break issues that occurred during Ramadan in

17

September 2008.  (Filing No. 344-5 at 239:22-240:16, 242:9-243:6.)  JBS disputes that the prayer policy was even a change, noting that Sydow merely testified he personally associated the change in policy with the events of Ramadan in 2008.  (Filing No. 429 at 15; Filing No. 344-5 at 242:9-243:3.)  Further, JBS notes that the new break guidelines state they are "intended to confirm the practice already in place."  (Filing No. 344-12 at 1.)  Doug Schult, JBS's head of labor relations, testified that the new guidelines changed the "standard practice" of not allowing people to leave the line for reasons "other than physical needs."  (Filing No. 344-2 at 260:2-4; 344-12.)  Schult also testified that there would have been no huge hurdles to implementing the guidelines in 2007 and 2008. (*Id.* at 260:7-13.)

## STANDARD

"Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  *Gage v. HSM Elec. Prot. Serv., Inc.,* 655 F.3d 821, 825 (8th Cir. 2011) (citing Fed. R. Civ. P. 56(c)). The court will view "all facts in the light most favorable to the non-moving party and mak[e] all reasonable inferences in [that party's] favor."  *Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 819 (8th Cir. 2011).  However, "'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.'"  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).

In response to the movant's showing, the nonmoving party's burden is to produce "evidentiary materials that demonstrate the existence of a 'genuine issue' for trial."  *Id.*

"[T]he absence of an adequate response by the nonmovant, even after the moving party has carried its initial burden of production, will not automatically entitle the movant to entry of summary judgment." *Lawyer v. Hartford Life & Acc. Ins. Co.*, 100 F. Supp. 2d 1001, 1008 (W.D. Mo. 2000) (citing *Celotex*, 477 U.S. at 331). Instead, "the moving party must show that the evidence satisfies the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Id.* (citing *Celotex*, 477 U.S. at 331). In other words, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"–where there is no "'genuine issue for trial'"–summary judgment is appropriate. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968)).

## DISCUSSION

JBS argues that summary judgment should be entered in its favor because the EEOC failed to satisfy certain conditions precedent--investigation and conciliation--prior to filing this lawsuit. With respect to the EEOC's pattern-or-practice claim based on alleged denial of religious accommodations, JBS also contends that summary judgment should be entered in its favor because the EEOC has failed to present sufficient evidence to support its claim that JBS failed to accommodate prayer requests. Further, JBS contends that the only accommodations the EEOC alleges JBS failed to provide were not reasonable and would have posed an undue burden on JBS. With respect to the EEOC's pattern-or-practice claim based on alleged unlawful terminations, JBS argues that summary judgment should be entered in its favor because the terminations were a one-time event and, therefore, cannot be the basis for a pattern-or-practice

19

claim; JBS had a legitimate, nondiscriminatory reason for terminating the aggrieved employees' employment; and the EEOC has failed to point to any evidence that indicates similarly situated employees were treated more favorably than the aggrieved Muslim employees.  Finally, with respect to the EEOC's pattern-or-practice claim based on alleged unlawful retaliation, JBS asserts that summary judgment should be entered in its favor because the EEOC has failed to point to any evidence indicating that JBS had a policy, or that there was a pattern, of retaliation against Somali Muslim employees, and the EEOC has failed to point to any evidence indicating that the aggrieved employees engaged in protected activity.

The EEOC argues that it has satisfied all conditions precedent to filing this lawsuit.  It contends that it was authorized to rely on the NEOC's investigation, the sufficiency of which the EEOC contends is not subject to judicial review.  Even if the NEOC's investigation were subject to judicial review, the EEOC asserts that evidence in the record supports the conclusion that the investigation was sufficient to meet Title VII's requirements.  The EEOC also argues that the evidence in the record is not only sufficient to support all three of its pattern-or-practice claims, thereby precluding the entry of summary judgment in JBS's favor, but that there is sufficient evidence in the record to establish the prima facie case of its religious accommodation claim as a matter of law.

## I.  Preconditions to Suit

Title VII requires the EEOC to satisfy two conditions before it brings suit against an employer: First, there must be an administrative investigation of the charges.  *EEOC v. Shell Oil. Co.*, 466 U.S. 54, 63-64 (1984).  Second, if the investigation establishes

reasonable cause to believe discrimination has occurred, the EEOC must attempt to eliminate the alleged discriminatory conduct through informal conciliation efforts. *Id.*, *see also EEOC v. Hickey-Mitchell Co.*, 507 F.2d 944, 948 (8th Cir. 1974). JBS claims the EEOC failed to satisfy the requisite preconditions because it failed to investigate the claims itself, instead relying on the investigations performed by the NEOC; and failed to engage in good faith conciliation efforts. For the reasons discussed below, the Court concludes that the preconditions to suit have been satisfied.

### A. Investigation

#### 1. The EEOC Can Rely On The NEOC's Investigation

The Court has previously found that the EEOC's pattern-or-practice claims arise under 42 U.S.C. § 2000e-6 ("Section 707"), not 42 U.S.C. § 2000e-5 ("Section 706"). (*See* Filing Nos. 296, 338.) JBS now argues that Section 707, unlike Section 706, authorizes only the EEOC to investigate charges of discrimination, and therefore the EEOC's claims cannot proceed because it relied on the investigations performed by the NEOC. The EEOC argues that Title VII, its implementing regulations, and the worksharing agreement between the EEOC and the NEOC (Filing No. 356-14), authorize the EEOC to rely on the investigation conducted by the NEOC. The parties agree that Section 706 authorizes the EEOC to delegate its duty to investigate charges of discrimination to state agencies. *See* § 2000e-5(c), (d), (e)(1). Section 707 states that the EEOC "shall have the authority to investigate and act on a charge of a pattern or practice of discrimination [and] such actions shall be conducted in accordance with the procedures set forth in section 2000e-5 [§706]." §707(e), 42 USC §2000e-6(e).

21

The Court concludes that § 707 of Title VII permits the EEOC to rely on the NEOC's investigation as a precedent to suit.  "[A]s with any question of statutory interpretation, the court begins its analysis with the plain language of the statute." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Supervalu, Inc.*, 651 F.3d 857, 862 (8th Cir. 2011).  JBS argues that § 707(e) makes a distinction between "investigations" and "actions", and only "such actions" must be conducted according to the procedures in § 706.  Further, JBS argues that Congress intentionally omitted any express reference to state and local Fair Employment Practices Agencies ("FEPAs") in § 707.  In contrast, the EEOC argues that the reference to "such actions" encompasses both the authority to act and to investigate, and that § 707 should be read to include a procedural mandate to follow § 706.

The parties' interpretations illustrate an ambiguity that is resolved by the overall statutory scheme of Title VII and evidence of Congressional intent.  Other sections within Title VII expressly contemplate the EEOC's cooperation with state and local agencies charges with the administration of a state's fair employment practices in carrying out the EEOC's functions and duties under Title VII.  *See, e.g.,* 42 U.S.C. § 2000e-8(b).  Further, § 705 broadly gives the EEOC authority "to cooperate with and, with their consent, utilize regional, State, local, and other agencies, both public and private, and individuals[.]"  The implementing regulations permit the investigation of a charge to be made by the EEOC, "its investigators, or any other representative designated by the Commission.  "  29 C.F.R. § 1601.15(a). The regulations expressly state that "[d]uring the course of such investigation, the [EEOC] may utilize the services of State and local agencies which are charged with the administration of fair

employment practice laws or appropriate Federal agencies, and may utilize the information gathered by such authorities or agencies." *Id.*

In the legislative history most closely on point, the House Committee on Education and Labor described the applicable language as "[a]ssimilat[ing] procedures for new proceedings brought under § 707 to those now provided for under Section 706 so that the Commission may provide an administrative procedure to be the counterpart of the present Section 707 action." H. Rep. No. 92-238, reporting H.R. 1746, 92d Cong., 2d Sess., 1972 U.S.Code Cong. & Admin.News 2137, at 2164 (reporting § 707(f) of H.R. 1746).

The parties cite to no case or authority expressly stating whether the EEOC is entitled to rely on the investigation of a FEPA such as the NEOC. However, courts have interpreted Title VII generally as promoting cooperation between the EEOC and state and local authorities. The United States Supreme Court has noted that "Congress envisioned that Title VII's procedures and remedies would 'mes[h] nicely, logically, and coherently with the State and city legislation,' and that remedying employment discrimination would be an area in which '[t]he Federal Government and the State governments could cooperate effectively.'" *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 63-64 (1980) (citing 110 Cong.Rec. 7205 (1964) (remarks of Sen. Clark)). In referring to the relationship between the procedures describes in § 706 as they apply to § 707, the Fifth Circuit has stated that "Congress apparently intended that the EEOC have investigative and conciliatory authority in 'pattern or practice' situations comparable to its existing powers in § 706 cases." *United States v. Allegheny-Ludlum Indus., Inc.*, 517 F.2d 826, 844 (5th Cir. 1975). The Supreme Court has recognized that

23

Title VII supports worksharing between the EEOC and state and local agencies, and is designed to promote "unnecessary duplication of effort or waste of time."   *EEOC v. Commercial Office Products Co.*, 486 U.S. 107, 122 (1988).  The Court agrees that the overall promotion of cooperation between agencies, and avoidance of duplicative effort suggests § 707 allows the EEOC to rely on the investigation performed by the NEOC. Accordingly, the EEOC has satisfied the procedural requirement of conducting an investigation of the charges.

## 2.    The Court Cannot Review The Sufficiency Of The Investigation

The Court will not review the sufficiency of the EEOC's pre-suit investigation because the existence of the investigation satisfies the pre-suit requirements.  Both parties agree that "[a]s a statutory prerequisite to suit, the EEOC must perform an investigation, and [c]ourts will review whether an investigation occurred."   *EEOC v. Hibbing Taconite Co.*, 266 F.R.D. 260, 272 (D. Minn. 2009).  JBS argues that the Court must also determine whether the investigation was incomplete, careless, or one-sided, or whether the investigation was "a sham enterprise undertaken to reach a predetermined conclusion."  (Filing No. 442 at 69.)  However, courts "have no business limiting the suit to claims that the court finds to be supported by the evidence obtained in the Commission's investigation."   *EEOC v. Caterpillar, Inc.*, 409 F.3d 831, 833 (7th Cir. 2005) (Posner, J.).  For this reason, "as a general rule, 'the nature and extent of an EEOC investigation into a discrimination claim is a matter within the discretion of that agency.'"   *EEOC v. CRST Van Expedited, Inc.*, 679 F.3d 657, 674 (8th Cir. 2012) (quoting *EEOC v. KECO Indus., Inc.*, 748 F.2d 1097, 1100 (6th Cir.1984)); *see also Caterpillar*, 409 F.3d at 833 (stating "The existence of probable cause to sue is

generally and in this instance not judicially reviewable.") (citing *FTC v. Standard Oil Co. of California,* 449 U.S. 232, 242-43 (1980)).

JBS claims that the Eighth Circuit's recent decision in *EEOC v. CRST Van Expedited, Inc.*, permits the Court to review the sufficiency of pre-suit investigations.  In *CRST,* the EEOC received charges of sex discrimination against the defendant trucking company, based on allegations of sexual harassment of female drivers/employees by two male drivers. During its pre-suit investigation, the EEOC discovered complaints against other male drivers, leading the EEOC to investigate the entire trucking company.  The EEOC brought a lawsuit under § 706 of Title VII on behalf of the charging employee, and "similarly situated female employees."  *CRST*, 679 F.3d at 664. The EEOC identified a total of 270 aggrieved individuals during pre-trial discovery, and later narrowed the number to 67.  The district court dismissed each of the EEOC claims for failure to comply with the pre-suit requirements.

The Eighth Circuit affirmed the district court's decision with respect to the EEOC's inability to recover an award for the 67 aggrieved individuals.  The undisputed facts in *CRST* demonstrated that the EEOC did not investigate allegations of 67 allegedly aggrieved persons until after the complaint had been filed; did not identify any of the 67 allegedly aggrieved persons as members of the Letter of Determination's "class" until after it filed the Complaint; did not make a reasonable-cause determination as to the specific allegations of any of the 67 allegedly aggrieved persons prior to filing the Complaint; and did not attempt to conciliate the specific allegations of the 67 allegedly aggrieved persons prior to filing the Complaint.  *Id.* at 673.  The Eighth Circuit concluded that the EEOC thus failed to satisfy all of its pre-suit obligations for each

individual claim.  *Id.*  The Eighth Circuit reasoned that there was an important distinction between facts gathered during a pre-suit investigation and facts gathered during the discovery stage of an already filed lawsuit.  *Id.* (citing *EEOC v. Dillard's Inc.,* No. 08–CV–1780–IEG (PCL), 2011 WL 2784516, at *5 (S.D.Cal. July 14, 2011) (slip op.).

Contrary to JBS's assertion, *CRST* is not an expansion of the Court's ability to review the substantive findings of the investigation.  In *CRST*, the issue was not whether the investigation was substantively sufficient, but whether the EEOC performed the investigation and conciliation steps before filing suit.  Here, JBS does not argue that it lacked notice of the individual claims or that an investigation was not performed.  Instead, JBS argues that that the investigation was flawed and substantively inadequate.  As noted in *CRST* and other authorities, the EEOC enjoys wide latitude to investigate charges of discrimination and to allege claims based on its findings in the investigation.  *Id.* at 675.  The nature and extent of the investigation is within the discretion of the EEOC, and the Court may not limit the suit to claims that the Court finds to be supported by the evidence obtained in the Commission's investigation.  *See CRST*, 679 F.3d at 674; *Caterpillar, Inc.*, 409 F.3d at 833.  Accordingly, as a general matter, the Court cannot review the sufficiency of the EEOC's investigation as a means of limiting the EEOC's claims.

### 3.    Charge of Hassan Duwane

The EEOC argues that even if it could not rely on the investigation performed by the NEOC, it satisfied the precondition through its own investigation of the charge filed by Charging Party Hassan Duwane ("Duwane").   JBS argues that the EEOC's investigation of Duwane's charge is invalid because there is no direct evidence that

Duwane ever field a charge and, even if there was, the EEOC failed to investigate Duwane's charge.  Because the Court finds the EEOC could rely on the investigation performed by the NEOC, it need not address the validity of the charge filed by Duwane for purposes of the EEOC's pattern-and-practice claims, and need not address whether the investigation satisfies the precondition of filing suit.

### B.     Conciliation

The Court concludes that the EEOC has made sufficient attempts to conciliate as a prerequisite to filing suit and, at the very least, its efforts preclude dismissal.  "The EEOC may bring a direct suit against an employer only after it has attempted to conciliate in good faith but failed to reach an agreement." *EEOC v. Trans States Airlines, Inc.*, 462 F.3d 987, 996 (8th Cir. 2006) (citing 42 U.S.C. § 2000e–5(f)(1); *Johnson v. Nekoosa–Edwards Paper Co.*, 558 F.2d 841, 848 (8th Cir.1977)). "Only if conciliation proves to be impossible do we expect the Commission to bring action in Federal district court to seek enforcement."  *EEOC v. Hickey–Mitchell Co.*, 507 F.2d 944, 948 (8th Cir.1974) (citing 118 Cong.Rec. 7563 (1972) (remarks of Congressman Perkins)).  "To satisfy the statutory requirement of good faith conciliation, the EEOC must '(1) outline to the employer the reasonable cause for its belief that the law has been violated; (2) offer an opportunity for voluntary compliance; and (3) respond in a reasonable and flexible manner to the reasonable attitudes of the employer.' " *EEOC v. UMB Bank, N.A.*, 432 F.Supp.2d 948, 954 (W.D.Mo. 2006) (quoting *EEOC v. Asplundh Tree Expert Co.*, 340 F.3d 1256, 1259 (11th Cir. 2003)).  "Whether the EEOC has adequately fulfilled its obligation to conciliate is dependent upon the 'reasonableness and responsiveness of the [EEOC's] conduct under all the circumstances.'" *Id.*  "The

27

EEOC's efforts should be considered sufficient if it made a sincere and reasonable attempt to negotiate by providing [the employer] with an 'adequate opportunity to respond to all charges and negotiate possible settlements.'" *Id.* (quoting *EEOC v. One Bratenahl Place Condominium Assoc.*, 644 F.Supp. 218, 220 (N.D.Ohio 1986)).

When a court determines that the EEOC has attempted conciliation, but has not done so in good faith, the Court may stay the proceedings for conciliation efforts to resume. *Hibbing Taconite Co.*, 266 F.R.D. at 273. *Cf. EEOC v. Die Fliedermaus*, 77 F.Supp.2d 460, 467–68 (S.D.N.Y.1999) (court stayed proceedings for thirty days due to a failure to conciliate in good faith where the EEOC had refused to inform the employer of how the EEOC had calculated compensatory damages; court noted that preferred remedy for failure to conciliate is not dismissal but instead a stay to permit such conciliation); *McGee Bros. Co.*, 2011 WL 1542148, at *7 (appropriate remedy for an alleged defect in the conciliation process is an additional opportunity to conciliate). Dismissal may only be an appropriate sanction under extreme circumstances. *Hibbing Taconite*, 266 F.R.D. at 273. *Cf. CRST*, 679 F.3d at 677 (affirming dismissal of the EEOC's complaint for a total failure to investigate, issue reasonable cause finding, or conciliate, and noting that "[h]ad the EEOC not wholly abdicated its role in the administrative process, the court might have stayed the instant action for further conciliation in lieu of dismissal.").

The Court concludes that the EEOC has completed the procedural requirement of conciliation. JBS argues that the EEOC's conciliation letters never identified a discriminatory policy or practice at the Grand Island Facility, and never identified or evaluated what sort of accommodation, if any, might be possible. However, JBS does

not dispute that conciliation efforts took place.  The record shows that the EEOC sent a conciliation letter to JBS demanding a monetary settlement and development of an effective plan for religious accommodation. (Filing No. 417 at 98-99.)  These letters outlined the EEOC's reasons for its belief that the law had been violated.  The letters noted that JBS failed to accommodate the religion of the charging party for each individual claimant, and that such accommodations would not have posed an undue hardship to JBS.  (*See* Filing Nos. 346 at 50-51; 358-12.)  JBS argues that this description falls short of advising JBS of any meaningful notice of facts underlying the EEOC's determination that Title VII had been violated.  However, the determination of whether the EEOC has fulfilled its obligation to conciliate is dependent upon the "reasonableness and responsiveness of the [EEOC's] conduct under all the circumstances."  *Asplundh Tree Expert Co.*, 340 F.3d at 1259.  The record shows that the parties engaged in a conciliation conference that included discussions about JBS developing an accommodation plan, and that JBS knew the facts and issues and was expected to formulate the detail of the plan.  (Filing Nos. 346 at 51; 417 at 98; Filing No. 357-2 at 2.)  Thus, the parties have attempted conciliation; no evidence suggests that these circumstances are sufficiently extreme to merit dismissal due to lack of conciliation; and JBS has not sought a stay to conduct further conciliation.  Accordingly, the Court concludes that the EEOC has satisfied the pre-condition of conciliation.

II.     **Religious Accommodation Pattern-or-Practice Claim**

    A.     **Application of the *Teamsters* Framework to EEOC's Phase I Claims**

JBS argues that because of the multiple individualized issues inherent in a religious accommodation claim, the method of proof articulated in *Int'l Bhd. of*

*Teamsters v. United States*, 431 U.S. 324 (1977), is inappropriate for this case, and the EEOC's religious accommodation pattern-or-practice claim should be dismissed.[8] (Filing No. 442 at 89.)   Specifically, JBS argues that religious accommodation claims are inappropriate for pattern-or-practice treatment because in order to show unlawful discrimination occurred, a plaintiff must make an individualized prima facie showing that the plaintiff had a sincerely held religious belief.   JBS points to two cases holding that the *Teamsters* framework is at least partly inapplicable to sexual harassment and disability discrimination claims. *See e.g., EEOC v. CRST Van Expedited, Inc.*, 611 F. Supp. 2d 918, 934 (N.D. Iowa 2009) (collecting cases and noting that sexual harassment pattern or practice cases are special because, "the *Teamsters* pattern or practice model breaks down when the unlawful employment practice at issue is sexual harassment based on a hostile work environment."); *Hohider v. United Parcel Serv., Inc*, 574 F.3d 169, 197–200 (3d Cir. 2009) (Rule 23 class could not be certified utilizing the *Teamsters* method of proof because class members ADA claims required individualized determination of whether each member was qualified under the statute).

The Court first notes that neither case cited resulted in dismissal of the applicable case.   For example, the district court in *CRST*, noted that the *Teamsters* model "breaks down" if the sexual harassment pattern or practice at issue is based on a hostile work environment.   *CRST*, 611 F. Supp. 2d at 934.   The district court in *CRST* concluded that if it found that it was "CRST's 'standard operating procedure' to tolerate sexual

_____

[8] The parties agreed that the claims arising in Phase I would be litigated under the *Teamsters* framework, though they retained the right to challenge whether harassment/hostile work environment claims are amendable to a pattern or practice method of proof.   (Filing No. 76-1 at 2.)

harassment in its workplaces, the court must apply the *Teamsters* burden-shifting framework as modified by [*Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 875-76 (D. Minn. 1993)]." *Id.* at 937. Thus, even though the *Teamsters* model "broke down," the court used a modified *Teamsters* analysis. Accordingly, even if the *Teamsters* model does not apply to pattern-or-practice claims based on religious accommodation, JBS has not explained why dismissal would be the appropriate remedy.

JBS does not suggest that the Court should follow a modified *Teamsters* model, or that another framework should be used. The Court notes JBS's concerns about the evidence showing that the religious beliefs of the claimants in this case may vary. However, these concerns can be addressed within the *Teamsters* framework. Title VII's implementing regulations require employers "to reasonably accommodate the religious practices of an employee or prospective employee, unless the employer demonstrates that accommodation would result in undue hardship on the conduct of its business." 29 C.F.R. § 1605.2(b)(1), (2). Thus, to the extent the individual workers' beliefs vary, JBS can present this evidence during Phase I of the trial as part of proving its hardship defense. *See EEOC v. JBS USA, LLC*, No. 10-CV-02103-PAB-KLM, 2011 WL 3471080, at *7 (D. Colo. Aug. 8, 2011). Further, to the extent the workers' varied beliefs related to prayer requests could affect Phase I of the trial, JBS has not requested that the Court reconsider bifurcation. In short, even if the evidence suggests that the workers' beliefs vary widely, the Court can find no reason that the *Teamsters* framework should not be applied, and no alternative framework has been set forth. Accordingly, the Court will apply the *Teamsters* framework to Phase I of the trial, unless the evidence demands that another standard must be applied.

31

**B.**   *Teamsters* **Standard in the Pattern-or-Practice Claim**

JBS assets that even if the Court proceeds under the *Teamsters* framework, the EEOC cannot meet its heavy burden.  Under the *Teamsters* framework "[a] pattern-or-practice lawsuit proceeds in two phases.  First, during the 'liability phase,' the plaintiffs are required to establish 'a prima facie case of a policy, pattern, or practice of intentional discrimination against [a] protected group.'"  *Reynolds v. Barrett*, 685 F.3d 193, 203 (2d Cir. 2012) (quoting *Robinson v. Metro-North Commuter R.R. Co*, 267 F.3d 147, 158 (2d Cir. 2001)).  To make out a *prima facie* case, "a plaintiff must prove that the employer 'regularly and purposefully,' treated members of the protected group less favorably and that unlawful discrimination was the employer's 'regular procedure or policy.'"  *EEOC v. McDonnell Douglas Corp.,* 191 F.3d 948, 951 (8th Cir. 1999) (internal citations omitted) (quoting *Teamsters,* 431 U.S. at 360).  "During the first stage of a pattern-or-practice case, for example, a summary judgment motion (whether filed by plaintiffs or defendants) must focus solely on whether there is sufficient evidence demonstrating that defendants had in place a pattern or practice of discrimination during the relevant limitations period."  *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1109 (10th Cir. 2001).  A pattern or practice exists when "the discriminatory acts were not isolated, insignificant, or sporadic, but were repeated, routine, or of a generalized nature; in other words, discrimination must have been 'the company's standard operating procedure— the regular rather than the unusual practice.'"  *Catlett v. Missouri Highway & Transp. Comm'n*, 828 F.2d 1260, 1265 (8th Cir. 1987) (quoting *Teamsters*, 431 U.S. at 336 & n. 16).

"Once the plaintiffs make out a prima facie case of discrimination in a pattern-or-practice case, the burden of production shifts to the employer to show that the evidence proffered by the plaintiffs is insignificant or inaccurate." *Reynolds*, 685 F.3d at 203. "Typically, this is accomplished by challenging the 'source, accuracy, or probative force' of the plaintiffs' statistics." *Id.* (quoting *Robinson*, 267 F.3d at 159 (internal quotation marks omitted)). "If the defendant satisfies its burden of production, the trier of fact must then determine, by a preponderance of the evidence, whether the employer engaged in a pattern or practice of intentional discrimination." *Id.*

### 1. Sufficiency of the EEOC's Proof of Pattern or Practice

JBS's arguments regarding the sufficiency of the EEOC's evidence are noted, but are not appropriate for summary judgment. As stated above, the EEOC bears the initial burden of coming forth with sufficient evidence to show that intentional discrimination was the defendant's "standard operating procedure." *Teamsters*, 431 U.S. at 336. To establish that discrimination was a standard operating procedure, "[n]ormally, the plaintiff will produce statistical evidence showing disparities between similarly situated protected and unprotected employees with respect to hiring, job assignments, promotions, and salary, supplemented with other evidence, such as testimony about specific incidents of discrimination.'" *Craik v. Minn. State Univ. Bd.,* 731 F.2d 465, 470 (8th Cir. 1984).

JBS concedes that statistical evidence is not always necessary to establish a prima facie case of discrimination. However, JBS states that the Court should take into account the lack of statistical evidence in making its determination. (*See* Filing No. 442 at 91 (citing *Craik*, 731 F.2d at 470)). The Court notes the lack of statistical evidence

33

supporting the EEOC's claims, but concludes that disposal of the EEOC's claims on that basis is insufficient for purposes of summary judgment.  The EEOC relies on the testimony of JBS's human resources generalist, supervisors, superintendents, and the business agent for the Union.  JBS argues that much of the testimony is inaccurately cited, taken out of context, and otherwise misrepresented.  (Filing No. 442 at 98.)  Much of JBS's challenge to the EEOC's characterization of the evidence is not centered on the content of the testimony, but relates to whether such testimony establishes a pattern or practice.  (*See e.g.* Filing No. 442 at 37, 39-57; *see also* Filing No. 429 at 7-15.)  The Court cannot conclude as a matter of law that the testimony cited by the EEOC fails to establish a pattern or practice, and factual issues remain about the sufficiency of the EEOC's evidence.

### 2.    Merits of the EEOC's Religious Accommodation Claim

JBS's argues that if even if the EEOC's evidence is sufficient to survive summary judgment, the EEOC cannot establish that JBS engaged in a pattern or practice of denying claimants a reasonable religious accommodation.   JBS argues that it provided Somali Muslim employees with a reasonable accommodation and that JBS had no policy of denying employees unscheduled breaks to pray.  JBS further argues that the EEOC cannot base its religious accommodation pattern-or-practice claim on changes to the meal break time; cannot demonstrate that unscheduled prayer breaks are reasonable; and cannot show that unscheduled prayer breaks would not pose an undue hardship.  The EEOC argues that it is entitled to judgment as a matter of law on its pattern-or-practice claim regarding JBS's denial in 2007 and 2008 of reasonable

accommodation of the aggrieved Somali Muslim employees' requests for unscheduled breaks to pray.  (Filing No. 343.)

The Court has thoroughly reviewed the arguments and evidence submitted by both parties and concludes that material issues of fact remain for trial on the EEOC's religious accommodation claim.  Such issues of fact may include, but are not limited to the following:

- The EEOC submitted evidence that JBS's corporate office set company-wide polices regarding the permissibility of unscheduled prayer breaks.  The EEOC cited the depositions of JBS human resources generalist Doug Schult, supervisor Salvador Prado, superintendent Roger Cooper, and Union business agent Terry Mostek, supporting to the proposition that JBS's corporate office set the policies regarding breaks for prayer.  (*See* Filing No 417 at 112-13.)

- JBS presented controverting evidence that JBS did not have a corporate policy for unscheduled prayer breaks for Somali Muslims.  (See e.g. Filing No. 442 at 42.)  JBS asserts that the company had no regular policy or practice in place concerning prayer during unscheduled breaks.  (*See* Filing No. 346 at 25.)  JBS cites the deposition testimony of several JBS representatives and employees to the effect that supervisors had discretion to permit unscheduled breaks depending on a number of factors, and that the witnesses were not aware of a company-wide policy regarding unscheduled prayer breaks.  (*See e.g.* Filing No. 347-1 at 127:4-128:14, 131:7-16, 232:14-21; Filing No. 347-2 at 58:17-59:3; Filing No. 347-4 at 92:24-:93-12, 123:6-16, 128:11-21; Filing No. 348-2 at 178:8-179:12.)

- JBS presented evidence that supervisors occasionally allowed people to leave the line for unscheduled breaks to pray and use the restroom, so long as the departure from the line did not create safety issues or cause product flow issues. (See *e.g.* Filing No. 348-3 at 31:3-15.)  At least one supervisor testified that in 2007 and 2008, JBS management directed him to allow a Somali Muslim to break for prayer if possible.  (Filing No. 348-4 at 124:15-21, 55:12-23, 61:1-62:8, 152:9-19, 153:2-5.)

- JBS presented evidence establishing issues of fact with respect to whether JBS's corporate office knew about religious accommodation requests and how the corporate office responded to such requests.  (Filing No. 420 at 142:13;  144:23.) JBS argues that the testimony cited by the EEOC does not establish the existence of a policy or regular practice related to supervisors granting or denying unscheduled prayer breaks.  (*See e.g.* Filing No. 350-3 at 57:3-59:19.)

- The EEOC argues that even if JBS did not have a company policy regarding breaks, JBS's break policy in 2007 and 2008 did not allow a person to be permitted to use a bathroom break to pray. (*See* Filing No. 417 at 117, 118-120.) Further, the EEOC presented evidence that Muslim employees could only pray on official breaks—the scheduled breaks or the meal breaks—under the CBA. (*Id.* at 117.) The EEOC argues that this evidence demonstrates that even though the CBA required JBS to provide reasonable accommodation to employees based on religious tenets, Somali Muslims were not allowed to use informal breaks to pray. (*Id.*; *see also* Filing No. 419-5 at 131:24-132:3.)

- The EEOC presented evidence that at some point JBS discussed changing the bathroom break policy to allow Muslim employees to pray during bathroom breaks and to honor that request just like a bathroom break request. (Filing No. 419-5 at 172:21-173:6.) The EEOC asserts that JBS changed the guidelines on August 10, 2009, to allow unscheduled breaks for prayer, at least during Ramadan; and that there were no hurdles to implementing the new guidelines in 2007 and 2008. (Filing No. 419-4 at 259:21-260:13; Filing No. 420-2.)

- JBS contends that the "new policy" regarding unscheduled breaks was intended to confirm the policy already in place. (Filing No. 358-13 at CM/ECF p. 5.) Further, JBS produced evidence that accommodation would create an undue burden on production at the Grand Island Facility. JBS presented testimony that it is in a competitive industry with low margins, and the more employees off the line and the longer they are away from the line, the greater the financial impact on JBS. (Filing No. 349-5 at 165:16-20, 197:18-22; 198:3-6.) In other words, the larger the number of employees seeking to leave the production line to pray, the harder it could be to accommodate them. (Filing No. 354-5 at 113:9-14, 114:4-24, 116:1-6.) The parties' conflicting evidence creates factual issues about the burden on JBS to accommodate the requests.

- The EEOC disputes the sufficiency and reliability of this evidence. (Filing No. 417 at 179.) The EEOC also submitted evidence that competitors in JBS's industry have accommodated unscheduled prayer breaks. (See Filing No. 417 at 137.)

- The parties dispute whether any action was taken to make sure that supervisors handled prayer issues on the production floor. JBS asserts that after the incidents of Ramadan 2008, JBS's Vice President of HR Jack Shandley advised Chmelka and Sydow that supervisors needed to be consistent when handling prayer issues, but that there was no evidence either of them took any action in response to Mr. Shandley's note. (Filing No. 346 at 15.) The EEOC argues that either Sydow or Chmelka told Union representative Terry Mostek that employees will be written up the first time they walk off the line for an unscheduled prayer break, and the second time, they would be terminated. (Filing No. 417 at 26.)

- The parties also disagree about whether JBS knew whether Somali Muslims believed there was less than a 45 minute window for praying after sunset. (*See* Filing No. 346 at 15; Filing No. 417 at 27.)

It is not feasible or advisable to outline every disputed material fact that remains at issue in the EEOC's reasonable accommodation claim.  In support of their respective motions and responses, the parties have submitted over 600 "statements of undisputed facts," many of which rely on the credibility of dozens of deposed witnesses, and the weighing of a large amount of evidence.  Where such credibility issues are key factors, summary judgment is generally inappropriate.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Keys v. Lutheran Family & Children's Services of Missouri*, 668 F.2d 356, 358 (8th Cir. 1981).  Courts do not treat summary judgment as if it were a paper trial.  *Archer Daniels Midland Co. v. Eco, Inc.*, 821 F. Supp. 2d 1083, 1093 (S.D. Iowa 2011).  Thus, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  The Court's job is only to decide, based on the evidence submitted, whether there really is any material dispute of fact that still requires a trial. *See id.* (citing *Anderson*, 477 U.S. at 249, and 10 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2712 (3d ed. 1998)).  The Court concludes that issues of fact remain about the EEOC's reasonable accommodation claim.  Accordingly, JBS's Motion for Summary Judgment on this issue is denied, and the EEOC's Motion for Summary Judgment is denied in its entirety.

**III.    Pattern or Practice of Unlawful Termination and Retaliation**

The Court concludes that the EEOC cannot establish a pattern or practice of unlawful termination or retaliation based on JBS's isolated termination of 80 Somali Muslim employees.  To succeed on a pattern-or-practice claim, the EEOC is required "to prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts."  *Teamsters*, 431 U.S. at 336.  In other words, in order to prove a pattern or practice of discrimination, plaintiffs must prove that unlawful discrimination is "the company's standard operating procedure," *Teamsters,* 431 U.S. at 336.  As the Supreme Court has explained, "it must be established by a preponderance of the evidence that '[the impermissible] discrimination was the company's standard operating procedure-the regular rather than the unusual practice."  *Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 875 (1984).  Multiple courts have recognized that multiple acts of discrimination are required to establish a pattern or practice.  For example, in *Sperling v. Hoffmann-La Roche, Inc.*, 924 F. Supp. 1346, 1364 (D.N.J. 1996), the court determined that no reasonable jury could find that an employer engaged in a pattern or practice of discrimination under the ADEA in conducting a one-time mass reduction in force.  The court reasoned that "pattern-or-practice claims are only appropriate where the class plaintiffs seek to enjoin the defendant from engaging in existing or threatened discriminatory behavior and because a "one-shot" event cannot constitute a pattern or practice of discrimination."  *Id.*  Similarly, in *Oinonen v. TRX, Inc.*, 3:09CV1450-M, 2010 WL 396112 (N.D. Tex. Feb. 3, 2010), the plaintiffs provided allegations related to a single mass layoff.  The court concluded that a single event was insufficient to demonstrate that unlawful discrimination was the company's standard

operating procedure rather than an isolated event.  *Id.* (citing *Cooper*, 467 U.S. 867, 875).

The Court finds the reasoning in these cases persuasive as applied to the undisputed facts in this case.  The EEOC does not allege that JBS adopted a declared, discriminatory termination policy, nor does it adequately connect the terminations to an unstated discriminatory policy.  The mass termination of 80 Somali Muslims serves as the sole basis for the EEOC's pattern-or-practice claims of unlawful termination and unlawful retaliation.  Although the EEOC refers to the mass termination as "eighty decisions to terminative eighty Somali Muslim employees,"  it is undisputed that mass termination was a single action in response to the events of September 18, 2008. Nevertheless, the EEOC claims that JBS had a pattern and practice because "[t]his decision-making is repeated and consistent discriminatory treatment that qualifies as a pattern or practice—regardless whether it happened in a single day or over several days or weeks." (Filing No. 417 at 186).  However, the EEOC provides no evidence that JBS terminated Somali Muslims as a matter of pattern or practice.  The Court concludes as a matter of law that the single mass termination is insufficient to establish a pattern or practice of unlawful termination or retaliation.

The EEOC attempts to interject evidence of mass terminations that occurred at JBS's Greely, Colorado, Facility a few days before the mass terminations at the Grand Island Facility, suggesting that the multiple mass terminations demonstrate a pattern. The incidents in the Greely, Colorado, Facility are the subject of a parallel case in the United States District Court, District of Colorado.  *See generally EEOC v. JBS USA,*

*LLC*, No. 10-CV-02103-PAB-KLM, at Filing No. 1(D. Colo. Aug. 8, 2011).[9]  The EEOC's Amended Complaint does not reference JBS's Greely, Colorado, facility, and the basis for its claims arise exclusively in the Grand Island Facility.  (*See* Filing No. 99.)  The EEOC chose to bring separate actions for each facility in separate forums, and now apparently seeks to use evidence from the Colorado action to support its pattern-or-practice claims in this case.  The Court concludes that its analysis should not include evidence from the Greely, Colorado Facility.  As of the writing of this Memorandum and Order, the case in Colorado remains in the discovery phase.  The EEOC has not provided sufficient evidence to show that the events in Greely, Colorado, occurred under the same circumstances as the events in Grand Island.  Allowing the EEOC to proceed to trial based in part on evidence from pertaining to the Colorado case before such evidence has been fully developed would be unfairly prejudicial to JBS, particularly where JBS had no notice that it would need to defend against claims in the Colorado case in this action.  Accordingly, the Court will not consider evidence from the facility in Greely, Colorado.

The EEOC also cites *Ste. Marie v. E. R. Ass'n*, 650 F.2d 395, 406 (2d Cir. 1981), for the proposition that it can sustain its pattern or practice claims based on a single occurrence.  In *Ste. Marie*, the court held that two alleged instances of sex discrimination by an employer when hiring for managerial positions was insufficient to support inference of pattern or practice.  *Id.*  The court noted that while "[w]hile the definition of a pattern or practice is not capable of a precise mathematical formulation, .

---

[9] On its own motion, the Court takes judicial notice of the parallel proceedings before the District of Colorado.

. . more than two acts will ordinarily be required." *Id.* (internal citations omitted). Despite the holding, the EEOC points to the court's statement that "[i]f there were evidence that a policy of discrimination had been adopted, perhaps two or even one confirmatory act would be enough." *Id.*

The EEOC alleges that JBS "made a policy choice at the corporate level to terminate dozens of Somali Muslims who engaged in work stoppages over the prayer issue but not to terminate dozens, even hundreds, of Hispanic/Catholic employees who engaged in the same or similar conduct -- work stoppages." Even if JBS's actions were discriminatory, the EEOC has not demonstrated that the terminations were more than a single event. Such a one-time occurrence is insufficient to demonstrate JBS's standard operating procedure, or show a pattern or practice. Such a ruling does not preclude arguments in Phase II that JBS's actions were discriminatory. Accordingly, the Court concludes the EEOC has not established a pattern or practice of unlawful termination, or unlawful retaliation.

## CONCLUSION

For the reasons stated above, the Court concludes that the EEOC has met the procedural requirements for bringing suit. Material issues of fact remain concerning whether JBS engaged in a pattern or practice of denying reasonable accommodation to its aggrieved Somali Muslim employees' requests for break times to pray. Finally, the Court concludes the EEOC has failed as a matter of law to establish a pattern or practice of unlawful termination or retaliation in violation of Title VII. Accordingly,

IT IS ORDERED:

41

1.     The Motion for Summary Judgment (Filing No. 342) filed by Defendant JBS USA, LLC f/k/a JBS Swift & Co., a/k/a Swift Beef Company ("JBS") is granted in part, as follows:

   a.     The Equal Employment Opportunity Commission's ("EEOC") claims that JBS engaged in a pattern or practice of unlawful termination based on religion and/or national origin are dismissed, with prejudice;

   b.     The EEOC's claims that JBS engaged in a pattern or practice of unlawful retaliation for engaging in protected activity in violation of Title VII are dismissed, with prejudice;

   c.     JBS's Motion is otherwise denied; and

2.     The Motion for Partial Summary Judgment (Filing No. 343) Filed by Plaintiff Equal Employment Opportunity Commission, is denied.

Dated this 12th day of April, 2013.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge