## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | **8:10CV318** |
| **Plaintiff,** | |
| **ABDI MOHAMED, et al.,** | **MEMORANDUM AND ORDER** |
| **Plaintiffs/Intervenors,** | |
| **FARHAN ABDI, et al.,** | |
| **Plaintiffs/Intervenors,** | |
| **vs.** | |
| **JBS USA, LLC,** | |
| **Defendant.** | |

This matter is before the Court on the Motion for Partial Judgment on the Amended Phase II Pleadings (Filing No. 751), the Motion to Dismiss Parties (Filing No. 781), and Motion for Summary Judgment (Filing No. 791), each filed by Defendant JBS USA, LLC ("JBS").  For the reasons stated below, the Motion for Partial Judgment on the Pleadings will be granted in part and denied in part; the Motion to Dismiss Parties will be granted; and the Motion for Summary Judgment will be granted.

## PROCEDURAL BACKGROUND

### I.    Phase I and Bifurcation

On April 15, 2011, Plaintiffs filed a joint Bifurcation Agreement to divide discovery and trial into two phases. Phase I involved pattern-or-practice claims presented by the Equal Employment Opportunity Commission ("EEOC").  (*See* Filing Nos. 76 at 3, 76-1.) Phase II was to address all individual claims for relief, and "[a]ny claims for which no pattern or practice liability was found in Phase I and any claims not tried in Phase I [to]

be tried under the traditional *McDonnell-Douglas* burden-shifting paradigm [in Phase II], including all claims of harassment/hostile work environment," as well as "[i]ndividual entitlement to back pay, compensatory, and punitive damages." (Filing No. 76.1 at 5.) On May 26, 2011, the Court adopted the Bifurcation Agreement. (Filing No. 81.)

Discovery proceeded, and trial was held on the EEOC's pattern-or-practice claims from May 7, 2013, through May 17, 2013. At the close of the EEOC's evidence, JBS made an oral motion for judgment on partial findings pursuant to Fed. R. Civ. P. 52(c). Based on the agreement of the parties as reflected in the Final Pretrial Order, the Court permitted the submission of deposition designations and objections after the close of trial. (*See* Filing No. 479 at 12.) On July 1, 2013, the EEOC submitted deposition designations in support of, and in addition to, testimony and evidence presented at the Phase I trial. On October 11, 2013, the Court issued its Findings of Fact and Conclusions of Law. (Filing No. 516.) The Court concluded that although the EEOC established a prima facie case of denial of religious accommodation, the requested accommodations imposed an undue burden on JBS.

## II.   Structure of Phase II Claims

Plaintiffs remaining at the Phase II stage of proceedings include the EEOC and several individual Plaintiff/Intervenors. For purposes of this Motion, the Plaintiff/Intervenors who remain are divided into three categories, based on their representation by different counsel, or no counsel. The first category consists of Plaintiff/Intervenors Abdi Mohamed, et al. ("First Intervenors").  The second category consists of Plaintiff/Intervenors Farhan Abdi, et al. ("Second Intervenors"). The third

category consists of Plaintiff/Intervenors no longer represented by counsel ("Pro Se Intervenors").

These categories are not to be confused with groupings used for purposes of discovery in the parties' Joint Proposal for Groupings of Claimants and Case Progression for Phase II, adopted by the Court on May 1, 2015 (the "Groupings Order"). (*See* Filing No. 665 at 1.)  The Joint Proposal divided remaining claimants into three groups for purposes of Phase II:  Group A included individuals whose employment ended prior to September 18, 2008.  Group B included individuals whose employment ended as part of the "mass termination" on September 18 and/or 19, 2008.  Group C included individuals whose employment ended after September 19, 2008, or who remained employed by JBS.  Discovery for Group B proceeded first.  The Plaintiffs collectively selected two claimants from Group B and JBS selected two claimants from Group B, for Phase II discovery.  Discovery and trial for Groups A and C are to commence after the Group B trial.

## III.   Remaining Intervenors and Claims

### First Intervenors

First Intervenors include Asha Abdi, Fatuma Abdullahi, Sirad Adan, Mohamud Ali, Ahmed Dalmar, Fartun Farah, Mohamed Jama Farah, Mohamed Mohamed, Ahmed Qurey, Istar Said, Shukri Wais, Fartun Warsame, and Burhan Yusuf.  (Third Am. Compl., Filing No. 721 at 5-6.)  The Court notes that Intervenors Hodan Abdulle, Shamso Abshir, Astur Egal, Khadija Hassan, Khadro Osman, and Deeq Said are all listed in the caption of First Invervenors' Third Amended Complaint and in the List of Phase II Aggrieved Individuals and Phase II Claims for Such Individuals (Filing No.

3

619)[1], but are not listed in the body of the Third Amended Complaint under "Intervenor I members."  (Filing No. 721 at 1, 5-6.)

First Intervenors present four counts in their Third Amended Complaint: Count I for wrongful termination based on "their religion, their prayer practices and/or requests for prayer accommodation" in violation of Title VII and the Nebraska Fair Employment Practices Act ("NFEPA"), Neb. Rev. Stat. §§ 48-1101 to 48-1125, 20–148 (Filing No. 721 at 7-8); Count II for wrongful termination based on national origin in violation of Title VII and the NFEPA (Filing No. 721 at 8); Count III for wrongful termination based on First Intervenors' "race/color (black)" in violation of Title VII and the NFEPA (Filing No. 721 at 8-9); and Count IV for wrongful termination based on retaliatory conduct in violation of Title VII and the NFEPA (Filing No. 721 at 9-10).

***Second Intervenors***

Second Intervenors present four counts in their Second Amended Complaint (Filing No. 724), though not all Second Intervenors assert the same claims.  Under Count I, Intervenors Rahma Mohamed Abdi, Sahra Botan, Saynab Farah, Mohammed Isak, Hawa Mohamud, Nimo Mohamed, Abdighani Muse, Maryan Muse (f/k/a Asha Muse), and  Ayan Osman allege hostile work environment and harassment on the basis of their religion, race, and national origin in violation of Title VII.  Under Count II, Intervenors Faydero Abdirahman, Abdirizaq Abdulle, Yasin Ahmed, Yusuf Dulane,

---

[1] The Statement lists individuals who are seeking relief in Phase II based on the claims alleging: (1) unlawful termination based on religion, Muslim and/or national origin, Somali, and/or race or color in violation of Title VII of the Civil Rights Act, as amended and the Nebraska Fair Employment Practices Act; (2) unlawful retaliatory discharge in violation of Title VII and the Nebraska Fair Employment Practices Act; and (3) unlawful termination and unlawful retaliatory discharge based on color and/or race in violation of 42 U.S.C. §1981.  (Filing No. 619 at 1-2.)

Amina Farah, Amina Gelle, Hawa Mohamud, Sugra Olad (f/k/a Hodan Sirad), and Abdirahman Ahmed Yusuf allege discriminatory discipline, retaliation, and unlawful discharge on the basis of their religion, race, and national origin in violation of Title VII. Under Count IV,[2] Intervenors Rahma Mohamed Abdi, Sahra Botan, Saynab Farah, Hawa Mohamud, Nimo Mohamed, Abdighani Muse, Maryan Muse (f/k/a Asha Muse), and Ayan Osman allege hostile work environment on the basis of their religion, race, and national origin in violation of 42 U.S.C. § 1981.  Finally, in Count IV, Intervenors Bashir Abdi, Farhan Abdi, Faydero Abdirahman (f/k/a Saynab Abdirahman), Abdirizaq Abdulle, Ahmed Adam, Mohamed Adan, Said Ali Ahmed, Sugule Ahmed, Yusuf Dulane, Amina Farah, Hassan Gabow, Amina Gelle, Abdikhadar Hassan, Mohamed Isak, Mohamed Isman, Musa Abdalla Mohamed, Sugra Olad (f/k/a Hodan Sirad), Mukhtar Omar, Ali Shire, Yusuf M. Solad, and Abdirahman Ahmed Yusuf allege discriminatory discipline, retaliation, and discharge on the basis of their religion, race, and national origin in violation of 42 U.S.C. § 1981.

### Pro Se Intervenors

Intervenors Asli Abdille Abdullahi (a/k/a Ambiya R. Roble), Said Adoow, Noor Ahmed, Ahmed Farah Ali, Ayan Ali, Rashid Yusuf Hundule, Abdirisak Adan Abdulahi (a/k/a Hussein Hussein), Abdulkadir Jama, Mohamed Jama, Abdalle Hassan Mahamud, Hanad Mohammed, Yusuf Hassan Mohamud (a/k/a Abdalle Ali Mohamud), Astur Mur (a/k/a Astur Nur), Warsame Nur, Ali Abdi Hakim Said, and Abdulqani Yusuf are no longer represented by counsel.  (Order dated July 27, 2015, Filing No. 710.)  JBS has

---

[2] The Second Amended Complaint (Filing No. 724) does not contain a Count III.

filed a Motion to Dismiss these Pro Se Intervenors due to "failure . . . to comply with the Court's July 28, 2015 and September 17, 2015 Orders." (Filing No. 782 at 3.)

## IV.   EEOC Claims

The EEOC filed its Third Amended Complaint ("EEOC Complaint"), alleging three causes of action on behalf of several aggrieved individuals identified in Revised Attachment A to the EEOC Complaint  (the "Aggrieved Individuals").[3]  (EEOC Compl., Filing No. 730 at ECF 16-19.)  Count I alleges religious discrimination in violation of Title VII on behalf of "aggrieved Somali Muslim employees" of JBS.  (Filing No. 730 at 9.) Count II alleges discrimination on the basis of the Aggrieved Individuals' national origin, in violation of Title VII.  Count III alleges JBS illegally retaliated against the Aggrieved Individuals based on their requests for religious accommodation, in violation of Title VII. The EEOC seeks injunctive relief against JBS, as well as money damages to make whole the Aggrieved Individuals due to loss in compensation and other pecuniary and nonpecuniary losses.

## V.   Group B Claimants

The parties selected the following four representative claimants for Group B discovery purposes:  Shamso Abshir, Tufah Hassan (formerly known as Sahara Noor and referred to in this Memorandum and Order as Sahara Noor), Abdiaziz Jama and Shukri Wais (referred to collectively as "Group B Claimants").  The EEOC seeks individual relief on behalf of all four Claimants. (*See* EEOC Compl. Doc. No. 730 at ECF 16-19.) First Intervenors seek individual relief for three of the Claimants: Abshir, Noor

---

[3] The Aggrieved Individuals include the names of 57 individuals, some of whom are also either Intervenors I or II.  (Filing No. 730 at ECF 16-17.)

and Wais. None of the four Claimants is a member of Second Intervenors.  (*See* Filing No. 724.)

## DISMISSAL FOR FAILURE TO COMPLY

The Court first addresses JBS's argument that the Pro Se Intervenors should be dismissed for failure to comply with the Court's Order of July 28, 2015 (Filing No. 711) and September 17, 2015 (Filing No. 748.

On July 27, 2015, counsel for the Farhan Abdi, *et al.*, Plaintiff/Intervenors filed a Motion to Withdraw, seeking to withdraw as attorneys for 16 Plaintiff/Intervenors.  (Filing No. 708.) The Court granted this motion on July 28, 2015, and the Council on American-Islamic Relations ("CAIR-Chicago") was granted leave to withdraw as counsel for the 16 Plaintiff/Intervenors. (Filing No. 711.)

The Court ordered CAIR-Chicago immediately to mail copies of the Order, by certified mail, to each of the Plaintiff/Intervenors, along with a letter "notifying them that it will no longer be representing them in this action, and detailing the overall status of this case." (*Id.* ¶ 2.)  On September 17, 2015, the Court entered a second Order (Filing No. 748), granting in part JBS's Motion to Compel Answers to Interrogatories and Request for Sanctions (Filing No. 689).  The Court ordered that the Plaintiff/Intervenors "shall supply verified responses to Defendant's interrogatories within forty-five (45) days of  this  Order. Failure to do so may result in the imposition of sanctions, including, but not limited to, dismissal of these Plaintiff/Intervenors' claims." (Filing No. 748 at 2.)  The Court further ordered that CAIR-Chicago "immediately mail copies of this Order, by certified mail, to the above-referenced Plaintiff/Intervenors at their last known addresses of record" and "file a certificate of service showing compliance with this Order."  (*Id.*)  On

7

September 20, 2015, CAIR-Chicago filed its Proof of Service, listing the 16 Plaintiff/Intervenors who had been served, via U.S. Certified Mail, with both of the Court's Orders and the explanatory letter, on September 18, 2015. (Filing No. 750.) The record shows that the Pro Se Intervenors failed to comply with either order.

Federal Rule of Civil Procedure 41(b) permits a defendant to move to dismiss any claims asserted against it by a plaintiff who "fails to prosecute or to comply with these rules or a court order . . . ."  Similarly, NECivR 41.2 provides, "[a]t any time, a case not being prosecuted with reasonable diligence may be dismissed for lack of prosecution." Here, the failure of the 16 *Pro Se* Plaintiff/Intervenors to comply with the Court's July 28, 2015 and September 17, 2015 Orders is grounds for dismissal of their remaining claims. *See, e.g., Aziz v. Wright,* 34 F.3d 587, 589 (8th Cir. 1994) ("An action may be dismissed pursuant to Rule 41(b) if a plaintiff has failed to comply with any order of the court"); *Henderson v. Renaissance Grand Hotel,* 267 Fed. Appx. 496 (8th Cir 2008) (affirming dismissal of plaintiff's Title VII action for failure to prosecute after finding that plaintiff failed to comply with court orders in a timely manner).

Dismissal for failure to comply with a court order is appropriate regardless of whether the plaintiff is represented by counsel. *See, e.g., Brantley v. BNSF Ry. Co.,* No. 4:12CV3215, 2014 WL 840641, *3 (D. Neb. March 4, 2014) (dismissing *pro se* litigant's case for failing to comply with court's discovery orders); *Dahl v. Kanawha Inv. Holding Co.,* 161 F.R.D. 673, 678 (N.D. Iowa 1995) ("Pro se litigants are not excused from complying with court orders or substantive and procedural law").  Where the Court orders a *pro se* plaintiff to file an update regarding his "intention to continue prosecution of his claims," failure to file such an update "or failure to do so in a timely manner will be

deemed failure to prosecute . . . and may be deemed willful disobedience of a court order, resulting in dismissal . . . pursuant to Fed. R. Civ. P. 41(b)." *Hancock v. Thalacker*, 933 F. Supp. 1449, 1461 (N.D. Iowa 1996).  Although a "*pro se* litigant should receive meaningful notice of what is expected of him," he is required to, at the very least, attempt in good faith to comply with the Court's orders. *Burgs v. Sissel,* 745 F.2d 526, 528 (8th Cir. 1984) (dismissing *pro se* plaintiff's case pursuant to Rule 41(b) after he failed to comply with the court's pretrial orders to clarify his claims).  Because the Pro Se Intervenors have not complied with the Court's Orders, pursuant to Fed. R. Civ. P. 41(b) and NECivR 41.2, all their remaining claims will be dismissed, with prejudice.

## MOTION FOR JUDGMENT ON THE PLEADINGS

### STANDARD OF REVIEW

"Judgment on the pleadings is appropriate where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law." *Minch Family LLLP v. Buffalo-Red River Watershed Dist.*, 628 F.3d 960, 965 (8th Cir. 2010) (citing *Faibisch v. Univ. of Minn.,* 304 F.3d 797, 803 (8th Cir. 2002)).  This is "the same standard used to address a motion to dismiss for failure to state a claim under Rule 12(b)(6)."  *Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).  "To survive a motion to dismiss, the factual allegations in a complaint, assumed true, must suffice 'to state a claim to relief that is plausible on its face.'"  *Northstar Indus., Inc. v. Merrill Lynch & Co.*, 576 F.3d 827, 832 (8th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[A]lthough a complaint need not include detailed factual allegations, 'a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *C.N. v. Willmar Pub. Sch., Indep. Sch. Dist. No. 347*, 591 F.3d 624, 629-30 (8th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555). "Instead, the complaint must set forth 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* at 630 (citing *Twombly*, 550 U.S. at 570).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ritchie v. St. Louis Jewish Light*, 630 F.3d 713, 716 (8th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotation marks omitted). "Courts must accept . . . specific factual allegations as true but are not required to accept . . . legal conclusions." *Outdoor Cent., Inc. v. GreatLodge.com, Inc.*, 643 F.3d 1115, 1120 (8th Cir. 2011) (quoting *Brown v. Medtronic, Inc.*, 628 F.3d 451, 459 (8th Cir. 2010)) (internal quotation marks omitted). When ruling on a defendant's motion to dismiss, a judge must rule "on the assumption that all the allegations in the complaint are true," and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 555, 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). The complaint, however, must still "include sufficient factual allegations to provide the grounds on which the claim rests." *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009).

10

**DISCUSSION**

**I.    EEOC's Fourth Amended Complaint**

The EEOC cannot seek individual relief on behalf of aggrieved individuals whose claims have already been dismissed in this lawsuit.  Accordingly, JBS argues that the EEOC's claims on behalf of twenty individuals must be dismissed.  Two of the individuals, JBS argues, must be dismissed because the EEOC did not include their names on the January 2015 List of Phase II Aggrieved Individuals.  The EEOC does not oppose dismissal of the two individuals—Mohamud Einead and Ali Salah—and the EEOC's claims on their behalf will be dismissed.

JBS also argues that the EEOC cannot seek recovery on behalf of eighteen other individuals (the "dismissed individuals")[4] who had been dismissed by the Court's Order of July 24, 2015 (the "Dismissal Order") (Filing No. 706) for failure to prosecute.  JBS argues that the EEOC cannot continue to seek individual relief for those whose claims have been dismissed with prejudice, because the doctrines of res judicata and "law of the case" prevent the EEOC from resurrecting dismissed claims.

"Under *res judicata,* a judgment on the merits in an earlier lawsuit bars a second suit involving the same parties based on the same cause of action." *Prof'l Mgmt. Assocs., Inc. v. KPMG LLP,* 345 F.3d 1030, 1032 (8th Cir. 2003).  "[R]es judicata can apply to prevent reassertion of dismissed claims, even though there remain live claims in the same litigation"  *Wintermute v. Kansas Bankers Sur. Co.*, 630 F.3d 1063, 1067

---

[4] These individuals are (1) Fadumo Abdi; (2) Ifra Abdullahi; (3) Abdiwali H. Adan; (4) Abdisalaan Ahmed; (5) Leyla Ahmed; (6) Kaltun Ali; (7) Rahma Hussein; (8) Fowsiya Ibrahim; (9) Mustafa Jama; (10) Ahmed Jibril; (11) Hawo  Mohamed; (12) Muna Mohamed; (13) Sahra Mohamud; (14) Said Nuuh; (15) Abdifatah Warsame; (16) Abdiaziz Yusuf; (17) Ahmed Hassan Yusuf; and (18) Maymun Yusuf.

11

(8th Cir. 2011) (quoting *Lair v. Oglesby*, 14 F.3d 15, 17 n.2 (8th Cir.1993)). "The requirements for application of *res judicata* are: 1) a final judgment on the merits, 2) based on proper jurisdiction, 3) between the same parties, and 4) based on the same claims or causes of action." *Wintermute*, 630 F.3d at 1067 (citing *Yankton Sioux Tribe v. U.S. Dep't of Health & Human Servs.,* 533 F.3d 634, 639 (8th Cir. 2008)). With respect to the EEOC's claims, it is undisputed that the second element has been met, because there have been no allegations of jurisdictional deficiencies.  The Court now must determine whether the first, third, and fourth elements of res judicata are met.

### A.    Final Judgment on the Merits

The first element has been met because, by rule, the Dismissal Order operated as an adjudication on the merits.  The doctrine of res judicata is "applied only when the party against whom the earlier decision is being asserted had a 'full and fair opportunity' to litigate the issue in question." *Lovell v. Mixon,* 719 F.2d 1373, 1376 (8th Cir. 1983) (quoting *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 481 n. 22 (1982)).  The EEOC appears to argue that res judicata cannot apply because the Dismissal Order was not on the merits, nor was it a final judgment.  Regarding the merits, the EEOC concedes that under Federal Rule of Civil Procedure 41(b), the Court's dismissal of the individual parties for failure to prosecute operated as an adjudication on the merits. (Filing No. 756 at 9.)  Nevertheless, the EEOC argues in the same sentence that the dismissed individuals' claims were not fully litigated and were dismissed only because they failed to respond to the Court's Dismissal Order.  This argument does not change the plain language of Rule 41(b), that a dismissal for failure to prosecute "operates as

12

an adjudication on the merits."  Further, the dismissed individuals received a full and fair opportunity to present their claims and neglected to do so.

The EEOC also asserts that the doctrine of res judicata requires a final judgment, and JBS's Motion fails because the Dismissal Order did not constitute a final judgment under Rule 54(b).  Rule 54(b) states that an order dismissing fewer than all the parties is not a final judgment from which an appeal lies.  However, for purposes of the res judicata analysis, the Eighth Circuit has instructed that "[t]he availability of judicial review is merely one factor to consider in determining whether issue preclusion applies." *John Morrell & Co. v. Local Union 304A of United Food & Commercial Workers, AFL-CIO*, 913 F.2d 544, 563 (8th Cir. 1990).  "[F]inality in the context of issue preclusion may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again."  *Id.* (quoting *Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir. 1961) (internal marks omitted)). The first element is not defeated merely because the Dismissal Order was not a final judgment.  Because the Dismissal Order, by rule, constituted an adjudication on the merits, the Court concludes that the first element of res judicata is established.

## B.    Privity Between the EEOC and the Dismissed Individuals

The third element is met because the EEOC is in privity with the dismissed individuals.  "The third element of res judicata requires that "both suits involve the same parties (or those in privity with them)."  *Rutherford v. Kessel*, 560 F.3d 874, 877 (8th Cir. 2009).  "When a government entity sues for the same relief that plaintiff has already *pursued* then the requisite closeness of interests for privity is present."  *California v.*

*IntelliGender, LLC*, 771 F.3d 1169, 1179 (9th Cir. 2014) (quotation marks and citation omitted) (emphasis in original). The EEOC argues that it is not in privity with the dismissed individuals, and is merely pursuing its own statutorily-authorized claims which have not been adjudicated. To assess privity, the Court examines the EEOC's statutory authority in relation to the interests of the dismissed individuals.

Title VII provides that the EEOC may bring its own enforcement action and grants the EEOC the right to obtain all statutory remedies available under the law, including back pay. *See* 42 U.S.C. §§ 2000e-5(f)(1) and (g)(1); *General Telephone Co. of the N.W., Inc. v. EEOC*, 446 U.S. 318, 324 (1980). Compensatory and punitive damages are available to a "complaining party" under the law against a respondent who engaged in unlawful intentional discrimination. 42 U.S.C. § 1981a(a)(1). The term "complaining party" is defined to include "the Equal Employment Opportunity Commission, the Attorney General, [or] a person who may bring an action . . . [under Title VII]." 42 U.S.C. §1981a(d)(1)(B). Thus, following "a straightforward reading of the statute," the Supreme Court has held that the EEOC is authorized "to sue in its own name to enforce federal law by obtaining appropriate relief for those persons injured by discriminatory practices forbidden by the Act." *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 324–25 (1980). "As a complaining party, the EEOC may bring suit to enjoin an employer from engaging in unlawful employment practices, and to pursue reinstatement, backpay, and compensatory or punitive damages." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 287 (2002).

The EEOC asserts that because the statutory scheme permits the EEOC to enforce the law independently, it is not barred from pursuing its claims on behalf of the

14

dismissed individuals.  The Supreme Court has "recognized the difference between the EEOC's enforcement role and an individual employee's private cause of action." *Waffle House, Inc.*, 534 U.S. at 287.  The Court has further explained that "the EEOC is not merely a proxy for the victims of discrimination . . . . Although [it] can secure specific relief, such as hiring or reinstatement . . . , on behalf of discrimination victims, the agency is guided by 'the overriding public interest in equal employment opportunity . . . asserted through direct Federal enforcement.'" *General Tel. Co.,* 446 U.S. at 326 (quoting 118 Cong. Rec. 4941 (1972)).  Based on the EEOC's distinct interest, the Supreme Court in *Waffle House* held that "[a]bsent textual support for a contrary view, it is the public agency's province—not that of the court—to determine whether public resources should be committed to the recovery of victim-specific relief. And if the agency makes that determination, the statutory text unambiguously authorizes it to proceed in a judicial forum." *Waffle House, Inc.*, 534 U.S. at 291–92.[5]

Despite the EEOC's distinct interests, courts have held that the EEOC is not permitted to "take a second bite of the apple" by asserting claims for make-whole relief on behalf of those whose claims were unsuccessful.  *See EEOC v. Sidley Austin LLP*, 437 F.3d 695, 696 (7th Cir. 2006) ("Even though (this is the doctrinal heart of *Waffle House*) the EEOC is not in privity with the victims for whom it seeks relief, it does not follow that they must be permitted to take two bites from the same apple.").  For

---

[5] Recognizing the diverging interests of the EEOC and individual victims, courts have permitted the EEOC to assert claims on behalf of individuals even where no individuals complained of discriminatory behavior, *EEOC v. Johnson & Higgins, Inc.*, 91 F.3d 1529, 1537 (2d Cir. 1996), or where the victim is judicially estopped from asserting the claim on his or her own.  *EEOC v. CRST Van Expedited, Inc.*, No. 07-CV-95-LRR, 2013 WL 321021, at *4 (N.D. Iowa Jan. 28, 2013).

example, in *EEOC v. Jefferson Dental Clinics, PA*, 478 F.3d 690, 699 (5th Cir. 2007), the Fifth Circuit noted the Supreme Court's holding in *Waffle House* was limited in that the Court stated that if an individual plaintiff "had accepted a monetary settlement, any recovery by the EEOC would be limited accordingly." *Jefferson Dental Clinics*, 478 F.3d at 699 (quoting *Waffle House*, 534 U.S. at 296–97 (internal marks omitted).  The Fifth Circuit explained that in the context of injunctive relief, the EEOC's interests are clearly present.  *Id.* at 698.  "In the context of make-whole relief, however, the interests of the EEOC stack up poorly against the principle of res judicata."  *Id.*; *see also California v. IntelliGender, LLC*, 771 F.3d 1169, 1181 (9th Cir. 2014) ("Allowing the State's claims for restitution to advance would undermine those longstanding principles of preclusion, which we and other courts have recognized time and again under the basic rule that when the government seeks individual relief on behalf of an already defeated litigant, res judicata usually applies.") (marks and citation omitted).

In this case, to the extent the EEOC seeks make-whole relief on behalf of the dismissed individuals in the form of back-pay and monetary damages, the EEOC is seeking relief that the dismissed individuals have already pursued.   Both parties recognize that neither the Eighth Circuit nor the Supreme Court have ruled whether the EEOC may seek make-whole relief on behalf of individual parties who have been dismissed for failure to prosecute in the same lawsuit.   However, the Supreme Court in *Waffle House* expressly limited its holding by noting that "it goes without saying that the courts can and should preclude double recovery by an individual."  *Waffle House*, 534 U.S. at 297 (internal marks omitted) (quoting *General Tel.,* 446 U.S. at 333).  In making that statement, the Supreme Court cited approvingly to *EEOC v. Goodyear Aerospace*

16

*Corp.*, 813 F.2d 1539 (9th Cir. 1987).   In *Goodyear Aerospace*, the Ninth Circuit recognized that, regarding the preclusive effect of pre-suit settlement, the statutory scheme supported the EEOC's right to seek injunctive relief to protect employees as a class, but mooted the EEOC's claim for back pay for an employee because "the public interest in a back pay award is minimal."   813 F.2d at 1543.   Similarly, although the EEOC has independent statutory authority to address discriminatory behavior, if the EEOC were permitted to pursue make-whole relief on behalf of the dismissed individuals, the Court would effectively be permitting an attempt at double recovery. The dismissed individuals had an opportunity to pursue their claims and obtain the very relief the EEOC now seeks on their behalf; however, their claims were dismissed with prejudice on the merits.   Accordingly, the EEOC is in privity with the dismissed individuals, and the third element is met.

### C.   Claims and Causes of Action

"The fourth requirement of res judicata is that 'both suits are based upon the same claims or causes of action.'"   *Yankton Sioux Tribe v. U.S. Dep't of Health & Human Servs.*, 533 F.3d 634, 641 (8th Cir. 2008) (quoting *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 673 (8th Cir. 1998)).   The Eighth Circuit has "determined that 'a claim is barred by res judicata if it arises out of the same nucleus of operative facts as the prior claim.'"   *Yankton Sioux Tribe*, 533 F.3d at 641 (quoting *Lane v. Peterson,* 899 F.2d 737, 742 (8th Cir. 1990)).   The EEOC does not assert that its claims are factually distinct from those of the dismissed individuals.   Rather, as discussed above, the EEOC argues that the very nature of the EEOC's legal interests renders its claims separate and distinct from the claims of the dismissed individuals.   Thus, the EEOC's position

17

with respect to the fourth element appears to be intertwined with its argument with respect to the third element—that the EEOC is not in privity with the dismissed individuals.  For the reasons discussed above, the Court concludes that the EEOC is in privity with the dismissed individuals.  Accordingly, because their claims arise out of the same nucleus of operative facts, the fourth element is met.

Because all elements of res judicata are met, the EEOC may not assert claims on behalf of the dismissed individuals.

## II.   First Intervenors' Third Amended Complaint

JBS asserts that several parties and claims in the First Intervenors' Third Amended Complaint must be dismissed.  First, JBS claims that seven members of First Intervenors failed to file Title VII administrative charges, and must be dismissed. Second, JBS alleges that these seven members' NFEPA claims are barred by the applicable statute of limitations.  Third, JBS also alleges that all the First Intervenors' race/color discrimination claims asserted in Count III of the Third Amended Complaint must be dismissed because the First Intervenors failed to allege any facts supporting those claims. Fourth, JBS asserts that the Title VII race/color discrimination claims asserted by thirteen members of First Intervenors must be dismissed because the thirteen individuals failed to allege race/color discrimination in their charges, and their NFEPA race/color discrimination claims are also time-barred. Fifth, JBS asserts that two of the First Intervenors who filed charges cannot maintain Title VII retaliation claims because they did not allege retaliation in their charges, and their NFEPA retaliation claims are also time-barred.  Finally, JBS asserts that all the Section 1981 claims asserted in the Third Amended Complaint must be dismissed.

18

A.      **Title VII Administrative Charges**

There is no dispute that seven members of the First Intervenors group failed to file administrative charges: (1) Hodan Abdulle, (2) Shamso Abshir, (3) Astur Egal Nur, (4) Khadija Hassan, (5) Tufah Hassan (f/k/a Sahara Noor), (6) Khadro Osman, and (7) Deeq Said.  For the reasons discussed below, their claims will not be dismissed for that reason.

 "Title VII requires that before a plaintiff can bring suit in court to allege unlawful discrimination, she must file a timely charge with the EEOC or a state or local agency with authority to seek relief."  *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 850 (8th Cir. 2012) (citing 42 U.S.C. § 2000e–5(e)(1)).   The charge requirement is "an elaborate administrative procedure, implemented through the EEOC, that is designed 'to assist in the investigation of claims of . . . discrimination in the workplace and to work towards the resolution of these claims through conciliation rather than litigation.'"  *Id.* (quoting *Patterson v. McLean Credit Union,* 491 U.S. 164, 180–81 (1989), *superseded by statute on other grounds,* Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071).

First Intervenors argue that the seven individuals who failed to file charges may pursue their claims based on the so-called "single-filing" or "piggyback" rule.  Under the single-filing rule, once a single plaintiff has filed an administrative charge, other plaintiffs may join the suit without filing separate charges by "piggybacking" on the original charge. *See Kloos v. Carter–Day Co.,* 799 F.2d 397, 400 (8th Cir. 1986) (applying piggybacking to an ADEA claim).  In the Eighth Circuit, the single-filing rule has applied only when the original filing places the administrative agency and the employer on

notice that class claims may follow. *Kloos,* 799 F.2d at 400.  Thus, to avoid undermining the twin goals of notice and conciliation, the charge must "fairly anticipate class claims." *Id.* For the single-filing rule to apply in a class action, the "administrative claim must give notice that the discrimination is 'class-wide,' *i.e.,* that it alleges discrimination against a class of which the subsequent plaintiff is a member." *Tolliver v. Xerox Corp.*, 918 F.2d 1052, 1058 (2d Cir. 1990) (describing the approach used in *Kloos* compared to the approach used by other circuits).

As this Court has noted before, the "Intervenors' claims are private, non-class Title VII actions."  (Filing No. 338 at 5.)   JBS's principal argument is that non-filing Intervenors' claims must be dismissed because the single-filing rule only applies in class action lawsuits, particularly in light of language from the Supreme Court's decision in in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).  In *Morgan*, the Supreme Court stated "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act [*i.e.*, each act that is not part of a continuing violation] starts a new clock for filing charges alleging that act."  *Id.* at 113.  Several courts have recognized the tension between the single-filing rule and the Supreme Court's holding in *Morgan*. *See, e.g., Horton v. Jackson Cnty. Bd. of Cnty. Comm'rs,* 343 F.3d 897, 900 (7th Cir. 2003); *Foster v. Ruhrpumpen, Inc.,* 365 F.3d 1191, 1198–99 (10th Cir. 2004); *Simpson v. Boeing Co.*, 27 F. Supp. 3d 989, 993 (E.D. Mo. 2014).  The Seventh Circuit in *Horton* explained that the conflict exists because the "single-filing rule dispenses not only with the need to file a separate charge for each violation of an employee's rights, but also and necessarily with the need to file a *timely* charge."  343 F.3d at  900 (emphasis in

original).  Thus, the Supreme Court's "reference to the 'clock' is also a reminder that the filing of a timely charge with the EEOC is . . . like a statute of limitations; and if there are two victims of the same or similar wrongful activity and one sues, his suit does not toll the statute of limitations for the other to sue."  *Id.* (citation omitted).  For these reasons, the Seventh Circuit speculated that "[a]fter *Morgan,* it is possible that the Supreme Court will limit the doctrine to class action cases."  *Id.* at 901.

Though other circuits have varied in their application of the single-filing rule after *Morgan*, only one circuit categorically limits the piggyback rule to class-actions.[6]  The Tenth Circuit has stated that the single-filing rule should still apply because "[t]he act of filing a charge is deemed 'useless' in situations in which the employer is already on notice that plaintiffs may file discrimination claims, thus negating the need for additional filings."  *Foster v. Ruhrpumpen, Inc.*, 365 F.3d 1191, 1197 (10th Cir. 2004).  The Tenth Circuit in Foster recognized that:

> Courts employ several different tests to determine when the single filing rule should apply.  The broadest test requires only that the claims of the administrative claimant and the subsequent plaintiff arise out of the same circumstances and occur within the same general time frame . . . .  A somewhat narrower test requires that the administrative claim give notice that the discrimination is "class-wide," i.e., that it alleges discrimination against a class of which the subsequent plaintiff is a member.  A still

---

[6] The Third Circuit has determined that, categorically, the single-filing rule does not apply to non-class actions.  *See Communications Workers of Am. v. New Jersey Dep't of Personnel*, 282 F.3d 213, 217 (3d Cir. 2002) (holding that filing a charge with allegations broad enough to support a subsequent class action lawsuit does not alleviate the burden of filing the class action itself).  The Third Circuit reasoned that permitting individual suits to go forward without an EEOC charge would "eviscerate the distinction between an action filed by an entity based on associational standing . . . and class actions, and the attendant requirements of class certifications and the associated procedural due notice and fairness safeguards as provided by Fed. R. Civ. P. Rule 23."  *Id.* at 218.  Accordingly, in the Third Circuit, "if plaintiffs choose to bring suit individually, they must first satisfy the prerequisite of filing a timely EEOC charge."  *Id.* (internal marks and citation omitted).

> narrower test requires that the administrative charge not only allege discrimination against a class but also allege that the claimant purports to represent the class or others similarly situated.

*Id.* at 1197-98 (quoting *Howlett v. Holiday Inns, Inc.*, 49 F.3d 189, 195 (6th Cir. 1995)). Recognizing the tension between the holding in *Morgan* and the single-filing rule, the Tenth Circuit concluded that *Morgan*, at most, supported a more limited test when applying the single-filing rule. *Id.* at 1198.

The Eighth Circuit recognized pre-*Morgan* that "[i]t is settled that a suit by a named member of a class in a class action may seek relief for the entire class without the necessity of other class members pursuing their administrative remedy with the EEOC." *Allen v. Amalgamated Transit Union Local 788*, 554 F.2d 876, 882 (8th Cir. 1977). In *Allen*, the Eighth Circuit further held that "although no class action was filed, 13 additional plaintiffs alleged facts demonstrating they were similarly situated and had received the same discriminatory treatment." *Id.* The court reasoned "[i]t would be wasteful, if not vain, for numerous employees, all with the same grievance, to have to process many identical complaints with the EEOC. If it is impossible to reach a settlement with one discriminatee, what reason would there be to assume the next one would be successful." *Id.* at 883 n.9. Thus, "[u]nder such circumstances, particularly where the discrimination is continuing it would be nonsensical to require each of the plaintiffs to individually file administrative charges with the EEOC." *Id.* at 882-83.

The Eighth Circuit expounded upon that reasoning in *Kloos*, stating that "[a]llowing class actions without administrative charges that fairly anticipate class claims would undermine the notice and conciliation purposes of the filing requirement." *Kloos,* 799 F.2d at 400. Thus, in *Kloos*, the Eighth Circuit clarified that for the single-filing rule

to apply, there must be an "allegation of class-wide discrimination or claim of class representation . . . to inform and give notice to the employer that the consequences of an individual plaintiff's charge may transcend an insolated individual claim." *Id.* The Eighth Circuit declined to apply the single-filing rule in *Kloos* because the only charges by persons connected with the case failed to allege class-wide discrimination or claim to represent a class, and the small number of charges failed to provide notice of potential class claims. *Id.* at 401.

The Eighth Circuit has not expressly stated whether the single-filing rule applies to non-class actions after *Morgan.*[7] However, it appears that the single-filing rule still has application in narrow circumstances.[8] In *Richter*, the court specifically noted that while the "reasonably related" exception was considerably more narrow post-*Morgan*,

---

[7] The Eighth Circuit has addressed the effect of *Morgan* with respect to the exhaustion of administrative remedies in the Title VII context. In *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 851 (8th Cir. 2012), the court addressed whether a plaintiff is required to file an administrative charge with respect to claims that are "like or reasonably related to" an alleged unlawful unemployment practice that the plaintiff properly exhausted. Previous to *Richter*, the Eighth Circuit had held that "allegations in a judicial complaint are 'cognizable' if the claims filed in court are 'like or reasonably related to' charges that were timely filed with the EEOC." *Id.* at 852 (quoting *Wentz v. Maryland Casualty Co.*, 869 F.2d 1153, 1154 (8th Cir.1989)). After *Morgan*, however, the Eighth Circuit disavowed the holding in *Wentz.* *Id.* The court explained that "[t]he overriding message of *Morgan* was to follow statutory text. 'Strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.'" *Id.* at 852 (quoting *Morgan*, 536 U.S. at 108). Therefore, following Morgan, "our most salient source for guidance is the statutory text." *Id.* (quoting *Morgan*, 536 U.S. at 109).

[8] District courts in this circuit have applied *Allen* to permit claims to go forward under the single-filing rule in non-class-actions even after *Morgan.* See *EEOC v. Von Maur, Inc.*, 237 F.R.D. 195, 199 (S.D. Iowa 2006) ("Under that rule a Title VII (or ADEA) plaintiff who has not filed an EEOC charge may join or 'piggyback' as a party-plaintiff with another who has filed a charge so long as the EEOC charge was timely and not defective and the charging and non-charging plaintiffs were similarly situated and received the same alleged discriminatory treatment."). *See also Mustafa v. United Auto Grp.*, No. 4:03CV00304, 2005 WL 1923107, at *3 (E.D. Ark. July 19, 2005) ("In accordance with *Allen,* the Court finds that the remaining Plaintiffs in this case may rely on the EEOC charge filed by Plaintiff Mustafa to support their individual Title VII claims.").

the court was reluctant to abandon it completely. *Richter*, 686 F.3d at 860; *see also Wedow v. City of Kansas City, Missouri,* 442 F.3d 661, 674 (8th Cir. 2006) ("[But] [w]hile our court has narrowed its view of what subsequent acts are sufficiently related to be within the scope of the properly filed administrative charges, we have not wholly abandoned the theory that reasonably related subsequent acts may be considered exhausted."). For the same reasons, the Eighth Circuit is unlikely to abandon the single-filing rule categorically. Following the reasoning in *Kloos* and *Allen*, the single-filing rule may apply if the unexhausted claim arises from the same unlawful conduct as the claims contained in the timely charge, and the charge must give "notice to the employer that the consequences of an individual plaintiff's charge may transcend an insolated individual claim." *Kloos,* 799 F.2d at 400.

In this case, the single-filing rule applies to the seven non-filing individuals based on the allegations in the charges. JBS received several charges alleging similar discriminatory behavior on the same date. (*See* Filing No. 753-2 at ECF 2-15.) Construed in a light most favorable to First Intervenors, the text of the charges provided some indication that the alleged discriminatory behavior affected more than the charging individual. For example, the charge of Intervenor Fatama Abdullahi alleged that she was discriminated against when she and ten other women were told to stop praying during their break time. (*See* Filing No. 753-2 at ECF 3.) The charge of Intervenor Sirad Adan alleged that JBS required a doctor's note from Somali women to use the restroom, while other employees were permitted to go to the bathroom without a note. (*See* Filing No. 753-2 at ECF 4.) Following the language in *Allen*, the seven non-charging individuals' claims relate to the same alleged discriminatory behavior as the

24

charging individuals.  Further, the large number of charges in conjunction with a mass termination indicated to JBS that there may be a class of individuals who experienced similar discrimination.  *See Horton,* 343 F.3d at 899 ("If for example the employer has fired every worker over the age of 40 and one of them has filed a timely charge, he can guess that others will, and there is no need to flood the EEOC with identical charges."). Accordingly, the allegations arising under Title VII of the seven non-charging First Intervenors will not be dismissed for their failure to file charges.

### B.    NFEPA Claims for the Seven Nonfiling Intervenors

JBS argues that, due to their failure to file charges, the NFEPA claims of the seven non-filing First Intervenors must be dismissed.  "[U]nder under Nebraska law, an NFEPA claim need not be administratively exhausted."  *Freeman v. GNS Corp.*, No. 4:14-CV-3203, 2015 WL 4622609, at *3 n.1 (D. Neb. July 30, 2015) (citing Neb. Rev. Stat. § 20–148; *Goolsby v. Anderson*, 549 N.W.2d 153, 157 (Neb. 1996)).  However, if an NFEPA charge is not filed, "the plaintiff must still observe the 300-day limitation period for NFEPA claims established by Neb. Rev. Stat. § 48-1118(2)."  *Id.* (*citing Adkins v. Burlington N. Santa Fe R.R. Co.*, 615 N.W.2d 469, 473 (Neb. 2000)).  In other words, NFEPA claims are time-barred if not filed within 300 days of the alleged unlawful activity.  *Adkins*, 615 N.W.2d at 473-74; s*ee also Rose v. Midwest Express Airlines, Inc.*, No. 801CV473, 2002 WL 31095361, at *5 (D. Neb. Sept. 19, 2002) ("The NFEPA specifically requires employment discrimination claims to be brought 'within three hundred days after the occurrence of the alleged unlawful employment practice.'") (quoting Neb. Rev. Stat. 48–1118(2)).

In this case, the seven First Intervenors who did not file charges have asserted NFEPA claims based on discharges that occurred in September 2008. (*See* Third Am. Compl. ¶¶ 35,46.) They did not file a charge or complaint regarding these NFEPA claims until November 8, 2010, the date they filed their original Complaint in Intervention (See Filing No. 69.) Because the seven non-filing Intervenors did not file their NFEPA claims within 300 days of their discharges, all of their NFEPA claims are time-barred and will be dismissed.

### C.    Section 1981 Claims based on National Origin

JBS argues that First Intervenors' national origin claims under § 1981 must be dismissed. As noted above, First Intervenors assert discrimination claims under § 1981 based on national origin (Somali) (Count II of the Third Amended Complaint). Though Title VII prohibits discrimination on the basis of race, § 1981 does not provide a basis for claims based on national origin. *Torgerson v. City of Rochester,* 643 F.3d 1031, 1052-53 (8th Cir. 2011) (en banc). Thus, First Intervenors' claims for discrimination on the basis of national origin under § 1981, as alleged in Count II, must be dismissed as a matter of law.[9]

### D.    Race Discrimination Claims

JBS argues that First Intervenors' race discrimination claims under Title VII and § 1981 must be dismissed. The allegations in the First Intervenors' Third Amended Complaint concerning race are that First Intervenors "are black in race/color" (Filing No. 721 ¶ 2); that fourteen of the Intervenors filed charges of discrimination alleging race/color discrimination (Filing No. 721 ¶ 5); and that "a motivating factor in the

---

[9] Count II also alleges national origin discrimination under Title VII and NFEPA.

Defendant's decision to discharge the members of the First Intervenors group was their race/color (black)" (Filing No. 721 ¶ 41).   JBS asserts that these allegations are too minimal to meet the plausibility standard to support a claim for racial discrimination.   A cause of action for race discrimination requires the plaintiff to show "'(1) that she is a member of a protected class; (2) that she was meeting her employer's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) that similarly situated employees outside the protected class were treated differently' or the circumstances give rise to an inference of discrimination."  *Smith v. URS Corp.*, 803 F.3d 964, 969 (8th Cir. 2015) (*quoting Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008)); *see also Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010). The minimal references to the First Intervenors' race amount to, at most, threadbare recitals of the elements of their race discrimination claims that fail to meet the plausibility standards in *Iqbal* and *Twombly*.  None of these allegations explains or suggests how JBS's actions were motivated by or resulted in race discrimination.  Thus, absent other facts that permit such an inference, First Intervenors' race discrimination claims under Title VII and § 1981 must be dismissed for failure to state a claim.

First Intervenors argue that their use of the term "Somali Muslim" in paragraphs 19 through 22 of the Third Amended Complaint permits an inference of racial discrimination.  First Intervenors assert that the term "Somali Muslim" can be construed to refer to the First Intervenors' race or ethnic characteristics in addition to their national origin.   This is so, according to First Intervenors, because paragraphs 19 through 22 refer to Hispanic employees; therefore, JBS should "know the color of their employees' skin" and reasonably infer that these paragraphs are highlighting the difference in treatment

between the First Intervenors and the Hispanic employees.  (*See* Filing No. 770 at 7-8.)

Thus, First Intervenors argue, references in paragraphs 19-22 to "Somali Muslims"

serve the dual purpose of (a) clarifying that their allegations are based, at least in part,

on their ethnicity rather than just their national origin, and (b) adding factual support to

their race discrimination claims.   The Court concludes that these allegations do not

serve either purpose because they fail to support an inference of discrimination on the

basis of race or ethnicity.

First Intervenors allege their § 1981 claims are based on their status as "an

ethnically and physiognomically distinctive subgrouping of homo sapiens."   *St. Francis*

*College et.al. v. Al-Kahazraji Aka Allan*, 481 U.S. 604, 613 (1987).  The issue before the

Supreme Court in *St. Francis College,* was whether "Arab" was considered a race

separate from "Caucasian," so as to support a claim for race discrimination under §

1981. The Court stated that "Congress intended to protect from discrimination

identifiable classes of persons who are subjected to intentional discrimination solely

because of their ancestry or ethnic characteristics. Such discrimination is racial

discrimination that Congress intended Sec. 1981 to forbid, whether or not it would be

classified as racial in terms of modern scientific theory."  *Id.*  Thus, the Court concluded,

"if respondent on remand can prove that he was subjected to intentional discrimination

based on the fact that he was born an Arab, rather than solely on the place or nation of

his origin, or his religion, he will have made out a case under § 1981." *Id.*

This Court has previously recognized that "[t]he line dividing the concepts of

'race' and 'national origin' is fuzzy at best, and in some contexts, national origin

discrimination is so closely related to racial discrimination as to be indistinguishable."

*Reyes v. Pharma Chemie, Inc.*, 890 F. Supp. 2d 1147, 1158 (D. Neb. 2012) (Gerrard, J.) (citing *Short v. Mando American Corp.,* 805 F. Supp. 2d 1246, 1267 (M.D. Ala. 2011)); *see also St. Francis Coll.*, 481 U.S. at 613 ("(Brennan, J., concurring) ("The line between discrimination based on ancestry or ethnic characteristics, . . . and discrimination based on place or nation of origin . . . is not a bright one."). The Eighth Circuit has stated that a claim based on ancestry or ethnic status "may be treated as both a race claim and a national-origin claim." *Torgerson*, 643 F.3d at 1053 (citing *Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.,* 154 F.3d 1117, 1119 n. 4 (9th Cir. 1998). In *Torgerson*, the Eighth Circuit upheld dismissal of a § 1981 race claim based on the plaintiff's Native-American status where the plaintiff failed to allege that the claim was based on race rather than national origin, and never amended his complaint to include race discrimination. *Id.* The court stated that "a race claim based on Native–American status must be stated as a race claim." *Id.*

The Court concludes that First Intervenors' use of the term "Somali Muslim" is not stated as a race claim. In following the Eighth Circuit's direction in *Torgerson*, the Court finds helpful the District of Maryland's approach, as stated in *Quraishi v. Kaiser Found. Health Plan of the Mid-Atl. States, Inc.*, No. CIV. CCB-13-10, 2013 WL 2370449, at *2 (D. Md. May 30, 2013):

> First, the plaintiff must demonstrate he actually faced intentional discrimination based on his ancestry or ethnic characteristics, rather than solely on his place of origin, in order to invoke the broad construction of race under § 1981. Second, where a plaintiff's allegations reference only his place of origin and do not focus on specific ethnic characteristics associated with that place of origin, the broad construction of race under § 1981 does not apply.

29

(citing *Akinjide v. Univ. of Md. E. Shore,* Civ. No. DKC 09–2595, 2011 WL 4899999, *8 (D. Md. Oct. 13, 2011) (internal marks and citation omitted).   Under either of these considerations, the Third Amended Complaint fails to support First Intervenors' race discrimination claims.   First, the Third Amended Complaint does not attempt to explain how First Intervenors suffered discrimination on the basis of any ethnic characteristics. The Third Amended Complaint references no physical differences or cultural attributes of Somalis that were "used as a fulcrum for discrimination."   *Garcia v. Gloor,* 618 F.2d 264, 270 (5th Cir. 1980).   Further, the text of the allegations focuses solely on First Intervenors' nationality and religious affiliation.   Although First Intervenors assert that JBS should know the skin-color distinctions of its Somali and Hispanic employees, paragraphs 19 through 22 of the Third Amended Complaint only once use the term "Hispanic."   (*See* Filing No. 721 ¶ 19 ("After hearing about the prayer accommodation provided to the Somali Muslim employees, numerous non-Somali, non-Muslim employees who were primarily Hispanic, refused to report to work and/or walked off their jobs in protest on September 17, 2009."))   Instead, paragraphs 19 through 22 refer generally to "non-Somali, non-Muslim employees."   These references focus not on any differences in physical or cultural attributes between Somalis and other employees, but instead focus primarily on the First Intervenors' national origin and religious practices. These allegations are insufficient to support a claim for race discrimination under § 1981, and provide no further support for First Intervenors' race discrimination claims under Title VII.[10]

---

[10] First Intervenors request that if the Court finds paragraphs 19 through 22 lacking because they do not use the term "non-Black", then First Intervenors should be permitted to amend the paragraphs to

### E.   Sirad Adan's Retaliation Claims

JBS alleges that Intervenor Sirad Adan's retaliation claim arising under Title VII and NFEPA must be dismissed because she failed to allege retaliation in her Charge of Discrimination.[11]   (See Filing No. 753-2 at ECF 4.)   Accordingly, she failed to exhaust her administrative remedies.   First Intervenors do not challenge this assertion, and instead request leave to amend the complain to "assert facts that conform to the evidence previously offered regarding the unlawful racial retaliation."   (Filing No. 770 at 8.)   The Court will not permit further amendment.   As noted, evidence regarding unlawful racial retaliation has been offered, and nothing prevented First Intervenors from asserting those facts at an earlier time.   Further, First Intervenors do not attempt to explain why Adan's retaliation claim should proceed.   Accordingly, Intervenor Sirad Adan's claim for retaliation under Title VII and NFEPA will be dismissed.

## III.   Second Intervenors' Second Amended Complaint

Regarding the Second Amended Complaint of Second Intervenors, JBS asserts that many of the Second Intervenors must be dismissed due to their for failure to file administrative charges.   JBS also argues that all of Second Intervenors' race-based

---

clarify the race of JBS's Hispanic employees.  Such an amendment would not cure the deficiencies in the allegations.  First, as noted above, the paragraphs at issue contain only a single reference to Hispanic employees.  First Intervenors' proposed amendment does not address the fact that the majority of the references are to the employees' status as non-Somalis and non-Muslims.  The proposed amendment does not present additional facts to demonstrate that JBS was "was motivated by or resulted in race or national origin discrimination."  *Reyes*, 890 F. Supp. 2d at 1159.  Second, First Intervenors have been given several opportunities to amend their complaint and refine their allegations, yet have failed to plead specific facts supporting its race discrimination claims.  At this stage in the proceedings, the Court concludes that amendment would be futile.  Accordingly, First Intervenors' claims for race discrimination in Count III of the Third Amended Complaint, will be dismissed.

   [11] The Charge identifies Intervenor Adan as "Sirat Adan."   However, the caption of the case identifies her as Sirad Adan.  The parties agree that Sirad Adan is the proper spelling and the Court will refer to her accordingly.

claims must be dismissed for failure to state a claim.  Finally, JBS asserts that Second Intervenors' claims under § 1981 must be dismissed in their entirety.

### A.    Single-Filing Rule

Only three—Farhan Abdi, Abdirahman Yusuf, and Hassan Duwane—of the thirty-two members of Second Intervenors filed charges of discrimination with the EEOC or NEOC. (*See* Second Am. Compl. ¶ 4; Filing No. 753-3.)  JBS argues that the twenty-nine[12] Intervenors who did not file charges cannot assert any Title VII claims because they failed to exhaust their administrative remedies and cannot take advantage of the single filing rule.

JBS argues that even if the single-filing rule applies in this case, it cannot be used by the Second Intervenors who failed to file charges.  The Court concludes that, for the reasons stated above with respect to First Intervenors, the non-filing Second Intervenors are permitted to piggyback their claims under the single-filing rule.  The charges filed by Intervenors Farham Abdi and Abdirahman Ahmend Yusuf are nearly identical to several of the charges filed by First Intervenors and Second Intervenors. Further, most of the charges were filed on October 3, 2008, the same date as those of all but two of the First Intervenors.  (*See* Filing No. 753-3 at ECF 2, 3; Filing No. 753-2.) The EEOC determination letters also specifically note that Intervenors Abdi and Yusuf made allegations on behalf of themselves and a class of Somali Muslim employees.

---

[12]   The twenty-nine individuals are (1) Bashir Abdi; (2) Rahma Mohamed Abdi; (3) Saynab Abdirahman, f/k/a Faydero Abdirahman; (4) Abdirizaq Abdulle; (5) Ahmed Adam; (6) Mohamed Adan; (7) Said Ali Ahmed; (8) Sugule Ahmed; (9) Yasin Ahmed; (10) Sahra Botan; (11) Mohamed Dhadin, f/k/a Yusuf Soldad; (12) Yusuf Dulane; (13) Amina Farah; (14) Saynab Farah; (15) Hassan Gabow; (16) Amina Gelle; (17) Abdikhadar Hassan; (18) Mohammed Isak; (19) Mohammed Isman; (20) Musa Abdalla Mohamed; (21) Nimo Mohamed; (22) Omar Mohamed; (23) Hawa Mohamud; (24) Abdighani Muse; (25) Asha Muse; (26) Mukhtar Omar; (27) Ayan Osman; (28) Abdirashid Ahmed Shire, f/k/a Ali Shire; and (29) Hodan Sirad, f/k/a Sugra Olad.

(*See* Filing No. 775-1 at ECF 14, 17.)   Accordingly, the charges gave "notice to the employer that the consequences of an individual plaintiff's charge may transcend an insolated individual claim."   *Kloos,* 799 F.2d at 400.  The Court concludes that the non-filing Second Intervenors will not be dismissed due to their failure to file individual administrative claims.

### B.    Title VII Race Discrimination Claims

Like the claims of First Intervenors, Second Intervenors' Second Amended Complaint fails to allow the court to draw a reasonable inference that JBS is liable for race discrimination. Second Intervenors argue their allegations are sufficient for each of their race-based claims under the notice pleading requirements of *Iqbal* and *Twombly*. In the context of discrimination claims, the Supreme Court has "negated any need to plead a prima facie case."   *Blomker v. Jewell*, ---F.3d---, No. 15-1787, 2016 WL 4157594, at *2 (8th Cir. Aug. 5, 2016) (citing *Swierkiewicz v. Sorema*, 534 U.S. 506, 512 (2002)).  However, the plausibility pleading standard under *Twombly* "asks for more than a sheer possibility that a defendant has acted unlawfully."   *Blomker*, 2016 WL 4157594, at *2 (quoting *Twombly*, 550 U.S. at 570).  Further, the "elements of the prima facie case are not irrelevant to a plausibility determination in a discrimination suit" and "are part of the background against which a plausibility determination should be made." *Id.* (citations and internal marks omitted); *see also Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009) (*en banc*) (alteration in original) (quotations and citations omitted) ("While a plaintiff need not set forth detailed factual allegations or specific facts that describe the evidence to be presented, the complaint must include sufficient factual allegations to provide the grounds on which the claim rests.").

Second Intervenors' Second Amended Complaint presents claims of race and color-based hostile work environment, harassment, discrimination, and retaliation under Title VII and § 1981. Second Intervenors' race-related factual allegations are (1) they are black (*see* Second Am. Compl., Filing No. 724 ¶¶ 44, 46), and (2) three of the Second Intervenors—Yasin Ahmed, Amina Farah, and Amina Gelle—were subjected to unspecified "racist remarks" or "racist insults" on an unidentified number of occasions (*id.* ¶¶ 83-85).   The only other references to the race of Second Intervenors are contained in the Claims for Relief as general descriptive summaries of the basis for their various discrimination claims.  (*See, e.g., id.* ¶¶ ("During 2007, 2008, and 2009 Plaintiff Intervenors were subjected to discriminatory treatment and harassment in . . . being subjected to racist, offensive insults by JBS supervisors and management on the basis of their religion, Islam, race, Black, and national origin, Somali.").)

These allegations are insufficient to support a claim for any race-based hostile work environment or harassment claims under Title VII or § 1981.  To establish a race based hostile work environment and harassment claim, plaintiffs must show "(1) they belong to a protected group, (2) they were subjected to unwelcome racial harassment, (3) the harassment was because of their race, and (4) the harassment was sufficiently severe or pervasive so as to affect 'a term, condition, or privilege of [their] employment.'" *Ellis v. Houston*, 742 F.3d 307, 319 (8th Cir. 2014) (quoting *Singletary v. Mo. Dep't of Corr.,* 423 F.3d 886, 892 (8th Cir. 2005)).  The Eighth Circuit recently held in *Blomker* that a complaint for hostile work environment and harassment failed to state a claim because it failed to plead that the harassment was "severe or pervasive enough to create an objectively hostile or abusive work environment."   *Blomker*, 2016 WL

34

4157594, at *3 (citing *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 801 (8th Cir. 2009)).  The court noted that "[m]ore than a few isolated incidents are required" and "offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  *Id.*  Similarly, in this case, Second Intervenors allege race discrimination based solely on vague, isolated comments made to only a few employees.  The Second Amended Complaint fails to provide any specificity as to the nature of the comments, nor does it provide any indication of their severity or pervasiveness.  Moreover, the thrust of the allegations focuses almost exclusively on JBS's response to the Second Intervenors' religious practices rather than their race.  Thus, the Second Amended Complaint fails to state a claim for hostile work environment and harassment under Title VII or § 1981.

Similarly, the Second Amended Complaint fails to state a claim for any race-based retaliation claims.  "The elements of a retaliation claim under § 1981 and Title VII are (1) protected activity, (2) subsequent adverse employment action, and (3) a causal relationship between the two."  *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997).  In *Blomker*, the Eighth Circuit held that the complaint failed to state a claim for retaliation as a matter of law for a lack of causation. 2016 WL 4157594, at *6.  The court reasoned that the plaintiff had "failed to plausibly allege that the retaliation was a but-for cause of [the employer's] adverse action."  *Id.*  The allegations with respect to race contained in the Second Amended Complaint fail to describe a causal relationship between protected activity and subsequent adverse employment action.  As noted above, the allegations focus almost exclusively on the Second Intervenors' activity with respect to their religious practices.  To create a causal connection would require the

35

Court to "conjure up unpled allegations" regarding JBS's treatment of the Intervenors on the basis of their race.   *See Gregory*, 565 F.3d at 473.  Accordingly, the Second Amended Complaint fails to state a claim for race-based retaliation under Title VII and § 1981.

### C.    Remaining Section 1981 Claims

Counts IV and V of the Second Amended Complaint assert claims under § 1981 based on the Second Intervenors' race, color, national origin, and religion.  For the reasons discussed above, Second Intervenors have not alleged facts sufficient to support their race-based claims.  As noted, though Title VII prohibits discrimination on the basis of national origin and race, § 1981 does not support claims based on national origin.  *Torgerson,* 643 F.3d at 1052-53.  Section 1981 also does not authorize claims based on religion. *See Saint Francis Coll.*, 481 U.S. at 606; *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998) ("It is also settled that Section 1981 does not prohibit discrimination on the basis of gender or religion."); *Anooya v. Hilton Hotels Corp.*, 733 F.2d 48, 50 (7th Cir. 1984) (stating that § 1981 "does not protect against discrimination based on sex or religion or age.").   Accordingly, Counts IV and V of the Second Amended Complaint will be dismissed in their entirety.

### CONCLUSION AS TO MOTION FOR JUDGMENT ON THE PLEADINGS

For the reasons stated, the Motion for Judgment on the Pleadings will be granted in part and denied in part.  The EEOC will not be permitted to seek make-whole relief on behalf of already dismissed individuals.  In general, at this stage, the Court will permit Intervenors who failed to file an administrative charges of discrimination to proceed under the single-filing rule.  Further, the operative complaints of both First Intervenors

and Second Intervenors are devoid of allegations supporting claims for race or national origin discrimination, and those claims will be dismissed

## SUMMARY JUDGMENT

## FACTUAL BACKGROUND

The parties have presented a voluminous factual record that includes thousands of pages of exhibits and hundreds of individually numbered statements of material fact. JBS asserts 195 individually numbered undisputed material facts as required by NECivR 56.1.  First Intervenors responded to each of JBS's statements In accordance with NECivR 56.1, and included an additional 282 individually numbered statements labeled as First Intervenors' "Statement of Additional Disputed Material Facts."  The EEOC also responded to each of JBS's statements and included an additional 509 individually numbered statements labeled as the "EEOC's Statement of Additional Material Facts."  Several of the EEOC's additional material facts are identical to those asserted by First Intervenors.

The Local Rules do not require an "additional statement of material facts," nor do they address whether a moving party must respond to additional statements of material facts.  The Eighth Circuit has upheld sanctions for "Statements of Additional Material Facts" where "voluminous filings were replete with conclusory allegations and legal argument, obfuscating any concise and specific statements of material fact that were contained within their pages."  *Nw. Bank & Trust Co. v. First Illinois Nat'l. Bank*, 354 F.3d 721, 725 (8th Cir. 2003).  Rules such as NECivR 56.1 are designed to "prevent a district court from engaging in the proverbial search for a needle in the haystack."  *Nw. Bank & Trust Co.*, 354 F.3d at 725.

JBS argues that the additional statements of fact submitted by First Intervenors and the EEOC are merely a tactic to make it appear that numerous factual issues remain to be determined.  While the Court will not conclude that such a tactic is at play, the statements of additional material facts filed by the EEOC and First Intervenors are voluminous and, in large part, repeat allegations and rely on the same evidence contained in responses to JBS's statement of undisputed material facts.  The Court has reviewed the entire factual and evidentiary record in this case, but will limit its summary of the facts to those specifically referenced by the EEOC and First Intervenors in their respective arguments.  *See id.*

The following is a summary of the pertinent facts stated in the parties' briefs, supported by pinpoint citations to evidence in the record,[13] according to NECivR 56.1[14] and Federal Rule of Civil Procedure 56,

## I.    Procedural Background

Pursuant to this Court's Order (Filing No. 665) regarding case progression for Phase II and the grouping of claimants for Phase II, this Motion for Summary Judgment

---

[13] JBS presented numerous facts that were included within the Court's Findings of Fact and Conclusions of Law based on the Phase I trial.  The EEOC and Intervenors oppose the use of such facts, asserting that "law of the case" does not apply.  Because the essential portions of the Court's analysis do not rely on any facts previously determined, the Court need not decide whether the law of the case applies at this time.

[14] *See* NECivR 56.1(b)(1) (effective December 1, 2015):

The party opposing a summary judgment motion should include in its brief a concise response to the moving party's statement of material facts.  The response should address each numbered paragraph in the movant's statement and, in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies.  <u>Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.</u>

pertains to four Group B claimants: Shamso Abshir ("Abshir"), Tufah Hassan (formerly known as Sahara Noor and referred to herein as Sahara Noor ("Noor")), Abdiaziz Jama ("Jama") and Shukri Wais ("Wais") (referred to collectively as "Claimants").  The EEOC seeks individual relief on behalf of all four Claimants.  First Intervenors seek individual relief for three of the Claimants: Abshir, Noor, and Wais.  None of the four Claimants is a member of the Second Intervenors.

All claims asserted by the EEOC and First Intervenors relate to the termination of Claimants' employment on September 19, 2008.  The EEOC asserts three claims under Title VII: (1) religious discrimination; (2) national origin discrimination; and (3) retaliation based on Claimants' requests for religious accommodations and complaints about denial of those requests.  (EEOC's Fourth Am. Compl., Filing No. 730, ¶¶ 47–71.)

Abshir, Noor and Wais—as members of First Intervenors—assert four claims: (1) religious discrimination in violation of Title VII and the NFEPA; (2) national origin discrimination under Title VII, the NFEPA, and 42 U.S.C. § 1981; (3) race/color discrimination under Title VII, the NFEPA, and § 1981; and (4) retaliation under Title VII, the NFEPA, and § 1981, based on their requests for religious accommodation, complaints about denial of accommodations, reports of "unlawful religious practices," and JBS's "failure to provide religious accommodation."  (Third Am. Compl., Filing No. 721, ¶¶ 2, 35–47.)  For the reasons stated above, Abshir's and Noor's Claims under the NFEPA are time barred.  Further, the claims of Abshir, Noor, and Wais for national origin discrimination under § 1981 will be dismissed, and their claims for race/color discrimination will be dismissed for failure to state a claim.

## II.    Factual Background

39

This case involves disputes regarding Somali Muslim employees' requests for religious accommodation involving breaks for prayers.  The events central to the Motion occurred during Ramadan in 2008.  On Friday, September 12, 2008, JBS management and representatives of the United Food and Commercial Workers Union Local No. 22 (the "Union") met with representatives of Somali Muslim employees.  The Muslim employee representatives stated that Muslim employees desired a mass break at sunset in order to perform their maghrib prayer. At the meeting, several accommodations were discussed, including changing meal times to coincide with prayer times.  JBS representative Dennis Sydow ("Sydow") told Muslim representatives that JBS could not meet their requests because he believed the requests violated the meal time requirements of the employees' collective bargaining agreement ("CBA").

On September 15, 2008, JBS leadership, Union representatives, and Muslim employees met again to discuss accommodation requests. Muslim employees explained their prayer requests and the required prayer times.  JBS management told the Muslim employees that they could not meet their requests, citing productivity, safety concerns in allowing a large number of employees to leave the line at the same time, as well as the requirements of the CBA.

On September 15, 2008, a large group of Somali Muslim employees gathered outside JBS's Grand Island, Nebraska, facility to protest JBS's refusal to accommodate their prayer requests and refused to report for work.  The Somali Muslim employees continued to refuse to work on September 16, 2008.  In the afternoon of September 16, 2008, JBS management, Union officials, and Somali Muslim representatives met to discuss prayer accommodations.  An agreement was reached that for the remainder of

Ramadan, the B-shift meal break would be a mass break at 7:45 p.m.; the shift would be shortened by 15 minutes to 7¾ hours; and the employees who failed to report for work on September 15 and 16 would have a letter placed in their files.  JBS sent a notice to Union representatives stating that further work stoppages could result in termination.  Claimants deny they ever receiving notice from Union officials.

On Wednesday, September 17, 2008, an unknown person posted signs around the plant in Spanish referencing the 7:45 p.m. break time and encouraging employees to "fight for their rights."  After hearing rumors about the mass meal break at 7:45 and the shortened shift, a large group of employees, many of whom were Hispanic, walked off the job and refused to return to the production floor. JBS management and union representatives told the protesting employees that they were violating the CBA and needed to continue working.  B-shift operations were cancelled that night due to lack of employees.

The following morning, Thursday, September 18, 2008, several hundred Hispanic employees on the A shift walked off the job and/or refused to start working to protest the company's decision to provide religious accommodation to the Somali Muslim employees.  In order to get the plant operating and avoid a shutdown, JBS management decided not to implement the agreement for the 7:45 p.m. mass break and to return the meal break to its original time.

In the afternoon or evening of September 18, 2008, JBS management told employees, through their Union leadership, that the next group of employees that refused to work would be terminated. (Schult Phase II Dep., Filing No. 793-32, 170:1–9, 170:22–171:14.)   Specifically, Doug Schult ("Schult") told two Union leaders, Kurt

41

Brandt and Oscar Saenz, to inform employees that the next group of employees that refused to work would be terminated. (Schult Phase II Dep., Filing No. 793-32, 170:22–171:10.)   JBS officials John Shandley ("Shandley") and James Colwell ("Colwell") instructed Sydow and human resources representative Mary Chmelka ("Chmelka") to tell the Somali leaders that the next group of employees that refused to work would be terminated.  (Schult Phase II Dep., Filing No. 793-32, 171:24–172:5.)

That night, at approximately 7:45 p.m., prior to the start of the meal break, ten to fifteen Somali Muslim employees left their positions while the lines were operating; these employees were sent to speak to Chmelka.  Chmelka began the process of preparing written disciplinary actions for these ten to fifteen employees for leaving the line without permission, but had time to prepare only one warning notice before the meal break began at 8:00 p.m., at which time Chmelka sent the employees to the cafeteria so they could take their break and end their Ramadan fast.  Chmelka planned to discipline the remaining employees after the meal break, but subsequent events in the cafeteria interrupted her plans.

In the cafeteria, a group of Somali Muslim employees began to engage in a loud demonstration to protest JBS's decision to rescind the break-time agreement.  At the end of the meal break, approximately 70–80 Somali Muslim employees remained in the cafeteria and police were called.  Several Somali Muslim employees left the plant.  The parties dispute whether the employees left out of protest or whether they were told to leave by JBS management.

Later that night, Shandley, Schult, and Colwell met in Sydow's office.  Shandley, Schult, and Colwell decided to terminate the employees who refused to go back to work

42

and left the plant that night.  Schult, Colwell, and Shandley believed that the employees who left the plant that night understood that, if they did not return to work, they could be terminated.  Chmelka was given the task to investigate and determine which employees left the plant and did not return to work.  Chmelka relied on the plant's payroll clerks, who looked at the "punch outs" on the plant's Kronos time-keeping system to determine which employees did not return to work after the meal break. The payroll clerks also spoke to all the supervisors in the fabrication department to identify which employees had not returned to work that evening.  Once the employees who left the plant were identified, their names were placed on a list of employees to be terminated.

All four Claimants—Abshir, Jama, Noor and Wais—were on the list of employees to be terminated.  Several non-Somali, non-Muslim Muslim employees were included on the list of employees to be terminated.  On September 19, 2008, when the employees who failed to return to work the previous night arrived at the plant, they were informed of their termination and given their final paychecks.  About 80 Somali Muslim employees were discharged, including Abshir, Jama, Noor and Wais.  The employees who were terminated were given a letter stating that they could call Chmelka at her direct telephone line with any questions.  JBS learned that some of the employees who were terminated did not actually walk out the previous night, and were terminated by mistake; those employees were allowed to return to work.  Several Somali Muslim employees returned to work after the meal break and did not leave the plant during the shift on September 18, 2008, and were not terminated on September 19, 2008.

**STANDARD OF REVIEW**

43

"Summary judgment is appropriate when, construing the evidence most favorably to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Crozier v. Wint,* 736 F.3d 1134, 1136 (8th Cir. 2013) (citing Fed. R. Civ. P. 56(c)). "[S]ummary judgment is not disfavored and is designed for every action." *Briscoe v. Cnty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (internal quotation marks omitted) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*) *cert. denied*, 132 S. Ct. 513 (2011)). In reviewing a motion for summary judgment, the Court will view "all facts and mak[e] all reasonable inferences favorable to the nonmovant." *Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.,* 703 F.3d 1104, 1107 (8th Cir. 2013). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact." *Id.* at 325. Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting Fed. R. Civ. P. 56(c)).

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that [its] claim should proceed to trial." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party "must do more than simply show that there is some

44

metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Briscoe,* 690 F.3d at 1011 (internal quotation marks omitted) (quoting *Torgerson*, 643 F.3d at 1042). "[T]he mere existence of some alleged factual dispute between the parties" will not defeat an otherwise properly supported motion for summary judgment. *Quinn v. St. Louis Cty.*, 653 F.3d 745, 751 (8th Cir. 2011) (internal quotation marks omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

In other words, in deciding "a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 972 (8th Cir. 2012) (internal quotation marks omitted) (quoting *Torgerson*, 643 F.3d at 1042). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue for trial" and summary judgment is appropriate. *Torgerson*, 643 F.3d at 1042 (internal quotation marks omitted) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

## DISCUSSION

JBS presents two principal arguments in support of its Motion for Summary Judgment. First, it argues that no material disputed facts could support a conclusion that its proffered reason for terminating the Claimants was pretext for race, religion, or national-origin based discrimination. Second, JBS alleges that Claimants cannot prove their retaliation claims as a matter of law.

## I.  Unlawful Termination based on Race, Religion, and/or National Origin

Abshir, Noor and Wais have alleged religious discrimination in contravention of Title VII and the NFEPA; national origin discrimination under Title VII, the NFEPA, and Section 1981; and race/color discrimination under Title VII, the NFEPA, and Section 1981.[15]   The EEOC has alleged discrimination under Title VII on the basis of religion and national origin.   Courts analyze claims arising under these statutes in accordance with the *McDonnell Douglas* burden-shifting framework. *See Orr v. Wal-Mart Stores, Inc.*, 297 F.3d 720, 723 (8th Cir. 2002); *Davis v. KARK-TV, Inc.*, 421 F.3d 699, 703 (8th Cir. 2005). *See also McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973).  A plaintiff without direct evidence of discrimination can survive summary judgment "by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext."  *Griffith v. City of Des Moines*, 387 F.3d 733 (8th Cir. 2004).   JBS concedes for purposes of this Motion that Claimants have stated a *prima facie* case for discrimination: (1) Claimants are members of a protected group; (2) Claimants were qualified for their position; and (3) Claimants were discharged; and (4) the Claimants were discharged "under circumstances giving rise to inferences of discrimination." *See McDonnell Douglas*, 411 U.S. at 802.

Claimants' *prima facie* case creates a presumption of discrimination and shifts the burden to Defendant to articulate a legitimate, non-discriminatory reason for termination. *Id.*; *see also Hilde v. City of Eveleth*, 777 F.3d 998, 1004 (8th Cir. 2015). On September 19, 2008, the stated reason for Claimants' discharge was (1) refusing to return to work after the meal break the previous night, which was insubordination, and

---

[15] As noted above, some of these claims have already been dismissed.

(2) withholding work in violation of the "No Strike" provision of the CBA.  Claimants concede that JBS stated a legitimate reason for firing the Claimants.

Because JBS has asserted a legitimate, non-discriminatory reason for Claimants' termination, the burden shifts back to Claimants to show JBS's proffered reason was pretextual.  *Wimbley v. Cashion*, 588 F.3d 959, 962 (8th Cir. 2009).  To prove pretext, a plaintiff "must demonstrate that a discriminatory animus lies behind [the employer's] neutral explanations."  *Arnold v. Nursing and Rehab. Center at Good Sheperd, LLC*, 471 F.3d 843, 847 (8th Cir. 2006).  "A plaintiff seeking to survive an employer's motion for summary judgment must therefore show a genuine issue for trial about whether the employer acted based on an intent to discriminate rather than on a good-faith belief that the employee committed misconduct justifying termination." *McCullough v. Univ. of Arkansas for Med. Scis.*, 559 F.3d 855, 862 (8th Cir. 2009).  "[Eighth Circuit] precedent establishes that the 'critical inquiry in discrimination cases like this one is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge.'"  *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1002 (8th Cir. 2012) (quoting *McCullough*, 559 F.3d at 861–62 (8th Cir. 2009)).

Claimants argue that JBS could not have had a good-faith belief that the Claimants were guilty of the conduct justifying the discharge because JBS's investigation of Claimants' conduct was insufficient.  Claimants also argue that the circumstances of the termination show the real reason for termination was discrimination on the basis of Claimants' race, religion, and/or national origin.  The Court concludes that the investigation shows no evidence of discriminatory motive, and

47

the circumstances of the termination do not suggest the proffered reasons for termination were pretextual.

### A.    Sufficiency of JBS's Investigation

Claimants argue that JBS's investigation of Claimants' involvement with the protest in the cafeteria was not conducted fairly or in good faith.  Specifically, Claimants argue that JBS's investigation was cursory at best and that an adequate investigation would have shown that Abshir, Jama, and Wais were told by management to leave the plant on the night of the protest.  "To overcome a motion for summary judgment, therefore, [Claimants] must present sufficient evidence that the employer acted with an intent to discriminate, not merely that the reason stated by the employer was incorrect." *Pulczinski*, 691 F.3d at 1003.  With respect to an employer's investigation of the proffered reason for termination,"[t]he appropriate scope of investigation is a business judgment, and shortcomings in an investigation do not by themselves support an inference of discrimination." *Wierman v. Casey's Gen'l Stores*, 638 F.3d 984, 997 (8th Cir. 2011).  An investigation is insufficient when it prevents the employer "from making a 'reasonably informed and considered decision' prior to terminating [the employee]." *Chivers v. Wal-Mart Stores, Inc.*, 641 F.3d 927, 935 n.6 (8th Cir. 2011) (quoting *Smith v. Chrysler Corp.,* 155 F.3d 799, 807 (6th Cir. 1998)).

To conduct its investigation, JBS reviewed time-keeping records and spoke to supervisors to identify the employees who left the plant before the end of the B-shift on September 18, 2008.  (*See* Chmelka Phase II Dep.,  Filing 793-25, 162:23–164:25.) The employees who were identified from this inquiry, including Claimants, were terminated.  (Chmelka Phase II Dep., Filing No. 793-25, 158:16–24.)  Schult, Colwell,

48

and Shandley each testified that they believed that the employees who left the plant that night understood that, if they did not return to work, they could be terminated. (Shandley Phase II Dep., Filing No. 793-34, 179:23–180:21); (Colwell Phase II Dep., Filing No. 793-27, 206:3–25); (Schult Phase II Dep., Filing No. 793-32,  74:2–76:14, 75:7–8, 175:21–176:4, 179:11–16.)

The Court cannot say that this investigation prevented JBS from making a reasonably well-informed decision regarding who violated the notice given through the Union on September 16, 2008.  Claimants' principal argument is that they were told by their supervisors on September 18, 2008, that they should leave the plant or were given permission to leave.  Even assuming this contention is true, it does not undermine the scope of JBS's investigation nor does it suggest a discriminatory animus.  Several Somali Muslim employees returned to work after the meal break and did not leave the plant during the shift on September 18, 2008, and were not terminated on September 19. After the investigation, JBS learned that some of the employees who were terminated did not actually walk out the previous night, and were terminated by mistake; those employees were allowed to return to work.  Further,  the employees who were terminated were given a letter stating that they could call Chmelka at her direct telephone line with any questions. (Chmelka Phase II Dep., Filing No. 793-25, 168:1–13, 208:7–10; Filing No. 794-33.)

Based on these undisputed facts, JBS's investigation leading to the termination letters does not support any inference of discrimination.  The JBS decision-makers' good faith belief, even if ultimately incorrect, was based on "objective evidence that corroborates the conclusion of the evaluators" and was "sufficient to justify a grant of

summary judgment." *Richey v. City of Indep.*, 540 F.3d 779, 783 (8th Cir. 2008). Claimants failed to demonstrate any genuine issue of material fact, suggesting that discriminatory animus may have influenced JBS's chosen method of investigation.

### B.     Work Environment

Claimants also assert that JBS's knowledge of the hostile work environment they suffered shows pretext for discrimination.  The Eighth Circuit has consistently rejected such theories.  *See, e.g. Wheeler*, 360 F.3d at 859 (stating that where plaintiffs were not alleging a hostile work environment claim, comments reflecting racial animus made by coworkers who were not the decision-makers were irrelevant and could not demonstrate pretext); *Clark v. Johanns*, 460 F.3d 1064, 1068 (8th Cir. 2006) (concluding that district court properly refused to consider evidence of hostile work environment toward women when deciding whether the plaintiff established that the employer's stated reason for not renewing her employment contract was a pretext for unlawful discrimination based on sex).

It is undisputed that Shandley, Schult, and Colwell made the decision to terminate the employment of all of the employees they believed refused to return to work after the meal break on September 18, 2008.  There is no allegation, much less any evidence, that Shandley, Schult or Colwell made any comments reflecting a discriminatory animus. Claimants cannot rely on alleged comments or conduct by other persons to establish that Shandley's, Schult's, and Colwell's stated reasons for the termination of Claimants' employment were a pretext for unlawful discrimination.

### C.     Treatment of Hispanic Employees

Claimants argue that pretext for discrimination is shown because JBS treated Somali Muslim employees less favorably than similarly situated Hispanic employees. "While instances of disparate treatment can support a claim of pretext, [the plaintiffs] have the burden to prove that they and [the comparators] were similarly situated in all relevant respects – a rigorous standard at the pretext stage." *Torgerson*, 643 F.3d at 1051. "Employees are similarly situated when they are involved in or accused of the *same offense* and are disciplined in different ways." *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 858 (8th Cir. 2004) *abrogated on other grounds by Torgerson*, 643 F.3d at 1043 (emphasis in original). To be similarly situated, "the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Wierman*, 638 F.3d at 994 (quoting *Cherry v. Ritenour Sch. Dist.,* 361 F.3d 474, 479 (8th Cir. 2004)). In claiming pretext on this basis, the Claimants' "burden for establishing 'similarly situated' at the pretext stage is rigorous." *Wheeler*, 360 F.3d at 858.

As of September 18, 2008, both the Somali Muslim employees and the Hispanic employees had engaged in work stoppages. On September 15, 2008, a large group of Somali Muslim employees gathered outside the facility to protest JBS's refusal to accommodate their prayer requests and refused to report for work. The Somali Muslim employees continued to refuse to work on September 16, 2008. On September 17, 2008, hundreds of Hispanic employees gathered at the Grand Island plant to protest JBS's decision to change the dinner break start time to accommodate the Somali, Muslim employees' religious beliefs and practices. These Hispanic protesters refused

to start and/or continue to work on the B shift despite instructions and statements from management and union representatives that they were violating the CBA.  The following morning, Thursday, September 18, 2008, several hundred Hispanic employees on the A shift walked off the job and/or refused to start working to protest their understanding of JBS's decision to provide religious accommodation to the Somali Muslim employees.  At that point, as of September 18, 2008, both Somali Muslim and Hispanic employees had engaged in work stoppages and both had been advised that, to the best of JBS's knowledge, their conduct violated the CBA and could result in discipline.  (Filing No. 793-11.)

As a result of the refusal to work by both the Hispanic and Somali Muslim employees, in the afternoon or evening of September 18, 2008, JBS management told employees, through their Union leadership, that the next group of employees that refused to work would be terminated.  (Schult Phase II Dep., Filing No. 793-32, 170:1–9, 170:22–171:14.)  Specifically, Schult told two Union leaders, Kurt Brandt and Oscar Saenz, to inform employees that the next group of employees that refused to work would be terminated. (Schult Phase II Dep., Filing No. 793-32, 170:22–171:10.) Shandley and Colwell instructed Sydow and Chmelka to tell the Somali leaders that the next group of employees that refused to work would be terminated.  (Schult Phase II Dep., Filing No. 793-32, 171:24–172:5.)

The definitive warning from JBS leaders on September 18, 2008, separates the Somali Muslims from Hispanic employees for purposes of showing pretext.  Prior to that point, JBS had warned employees that work stoppages could result in discipline, including termination.   Both Hispanic employees and Somali Muslim employees

52

engaged in work stoppages without being terminated. However, after JBS leaders communicated their zero-tolerance position on September 18, 2008, only Somali Muslim employees engaged in a work stoppage. Regardless of whether the individual Claimants actually received this communication from Union leadership, the undisputed evidence shows that JBS reasonably relied on Union leaders to communicate the message. Further, the act of communicating the message to Union leaders demonstrated an effort by JBS to communicate to all groups that it would strictly enforce the terms of the collective bargaining agreement. Because only Somali Muslim employees engaged in a work stoppage after this communication, any comparison to Hispanic employees for pretext purposes is improper. *See Wierman*, 638 F.3d at 994 ("[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.") Claimants have failed to meet their heavy burden of showing Hispanic employees and Somali Muslim employees were similarly situated for purposes of establishing pretext.

The undisputed evidence demonstrates that Claimants failed to show any issue of material fact remains as to whether JBS's proffered reason for termination was pretext for unlawful discrimination. The only potential link between JBS's proffered reason for termination and Claimants' assertions of discrimination on the basis of race, religion, or national origin, is that Somali Muslim employees were treated unfairly compared to similarly situated non-Muslim, non-Somali employees. For the reasons stated, the groups of employees were not similarly situated. Accordingly, Claimants

53

cannot establish pretext and their claims based on race, religion, national-origin discrimination will be dismissed.

## II.    Retaliation

 "To survive a motion for summary judgment, [Claimants] must show a *prima facie* case of retaliation and must show the proffered legitimate non-retaliatory reasons for [their] termination were pretextual." *Gibson v. Geithner*, 776 F.3d 536, 540 (8th Cir. 2015) (applying the burden-shifting analysis of *McDonnell Douglas* because the plaintiff lacked direct evidence of discrimination).  Under *McDonnell Douglas,* a Claimant bears the initial burden of establishing a *prima facie* showing of retaliation.  *Id.*  "To establish a *prima facie* retaliation claim under Title VII, an employee must show: (1) he engaged in protected conduct; (2) a reasonable employee would have found the retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct."  *Id.* (citing *Pye v. Nu Aire, Inc.,* 641 F.3d 1011, 1021 (8th Cir. 2011)).  If Claimant makes this *prima facie* showing, the burden shifts to JBS to articulate a legitimate, non-retaliatory reason for the adverse action.  *Id.*  Once JBS does so, the burden shifts back to Claimants to show Claimants' proffered reason was pretext.  *Id.* (citing *McDonnell Douglas,* 411 U.S. at 802).

Here, the adverse action was the terminations that occurred after JBS's investigation revealed that the Claimants left work without authorization.  That adverse action was not causally linked to any protected conduct.  Accordingly, Claimants have failed to make a prima facie showing of retaliation.  Even if a prima facie showing were inferred, JBS articulated a legitimate, non-retaliatory reason for the adverse action and the Claimants cannot demonstrate genuine issues of material fact as to pretext,

because "[t]he relevant inquiry is whether [JBS] *believed* [Claimants were] guilty of the conduct justifying discharge." *Chivers*, 641 F.3d at 934 (emphasis in original) (quoting *Richey,* 540 F.3d at 784).  "This is because 'if the employer takes an adverse action based on a good faith belief that an employee engaged in misconduct, then the employer has acted because of perceived misconduct, not because of protected status or activity.'" *Id.* (quoting *Richey,* 540 F.3d at 784).

The undisputed evidence shows that JBS terminated Claimants on a good faith belief that they engaged in misconduct under the CBA by leaving work without authorization.  Whether or not the Claimants knew that JBS would enforce the CBA and terminate employees who left work without authorization, the evidence demonstrates that JBS's zero-tolerance warning preceded the Somali Muslims' protest later that evening.  Thus, it cannot be said that JBS's decision to enforce the CBA was a reaction to Claimants' protest activities later that night.

The evidence before the Court demonstrates that Claimants were terminated "because of perceived misconduct, not because of protected status or activity."  *See id.* (citation omitted).  Accordingly, Claimants' retaliation claims will be dismissed.

### CONCLUSION AS TO MOTION FOR SUMMARY JUDGMENT

For the reasons stated above, the Motion for Summary Judgment will be granted. The EEOC may not assert claims on behalf of the Claimants for religious or national origin discrimination, or retaliation, as alleged in Counts I, II, and III of  the EEOC's Third Amended Complaint (Filing No. 723).  The claims of Abshir, Noor and Wais asserted in Counts I, II, III, and IV of the First Intervenors' Third Amended Complaint (Filing No. 721) are likewise dismissed.

IT IS ORDERED:

1.     The Motion for Partial Judgment on the Amended Phase II Pleadings (Filing No. 751), is granted in part, as follows:

     a.     The EEOC may not assert claims on behalf of the following individuals: (1) Fadumo Abdi; (2) Ifra Abdullahi; (3) Abdiwali H. Adan; (4) Abdisalaan Ahmed; (5) Leyla Ahmed; (6) Kaltun Ali; (7) Rahma Hussein; (8) Fowsiya Ibrahim; (9) Mustafa Jama; (10) Ahmed Jibril; (11) Hawo Mohamed; (12) Muna Mohamed; (13) Sahra Mohamud; (14) Said Nuuh; (15) Abdifatah Warsame; (16) Abdiaziz Yusuf; (17) Ahmed Hassan Yusuf; (18) Maymun Yusuf; (19) Mohamud Einead; and (20) Ali Salah;

     b.     The claims of Intervenors (1) Hodan Abdulle, (2) Shamso Abshir, (3) Astur Egal Nur, (4) Khadija Hassan, (5) Tufah Hassan (f/k/a Sahara Noor), (6) Khadro Osman, and (7) Deeq Said, arising under NFEPA, are dismissed, with prejudice;

     c.     All claims asserted by First Intervenors (Abdi Mohamed, *et al.*) for discrimination on the basis of national origin under 42 U.S.C. § 1981, as alleged in Count II of their Third Amended Complaint, are dismissed, with prejudice;

     d.     All claims asserted by First Intervenors (Abdi Mohamed, *et al.*) for discrimination on the basis of race, as alleged in Count III of their Third Amended Complaint, are dismissed, with prejudice;

      e.     Intervenor Sirad Adan's claim for retaliation under Title VII and NFEPA, is dismissed, with prejudice;

      f.     All claims asserted by Second Intervenors (Farhan Abdi, *et al.*) in their Second Amended Complaint for discrimination and retaliation on the basis of race under Title VII and § 1981 are dismissed, with prejudice;

      g.     All claims asserted by Second Intervenors (Farhan Abdi, *et al.*) in Counts IV and V of the Second Amended Complaint, are dismissed, with prejudice;

      h.     The Motion for Judgment on the Pleadings is otherwise denied;

2.     The Motion to Dismiss Parties (Filing No. 781), is granted;

3.     Any claims asserted by Intervenors (1) Asli Abdille Abdullahi a/k/a Ambiya K. Roble, (2) Said Adoow, (3) Noor Ahmed, (4) Ahmed Farah Ali, (5) Ayan Ali, (6) Rashid Yusuf Hundule, (7) Abdirisak Adan Abdulahi a/k/a Hussein Hussein, (8) Abdulkadir Jama, (9) Mohamed Jama, (10) Abdalle Hassan Mahamud, (11) Hanad Mohammed, (12) Yusuf Hassan Mohamud a/k/a Abdalle Ali Mohamud, (13) Astur Mur a/k/a Astur Nur, (14) Warsame Nur, (15) Ali Abdi Hakim Said, and (16) Abdulqani Yusuf, are dismissed, with prejudice;

4.     The Motion for Summary Judgment (Filing No. 791) is granted;

5.     The EEOC's claims on behalf of the Claimants for religious or national-origin discrimination, or retaliation, as alleged in Counts I, II, and III of the

EEOC's Third Amended Complaint (Filing No. 723), are dismissed, with prejudice; and

6.    The claims of Abshir, Noor and Wais asserted in Counts I, II, III, and IV of the Third Amended Complaint of the First Intervenors (Abdi Mohamed, *et al.*) (Filing No. 721), are dismissed, with prejudice.

Dated this 19th day of August, 2016

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge